574 S.E.2d 433 (2002)
258 Ga. App. 387
In the Interest of C.M. et al. (Two Cases).
Nos. A02A1264, A02A1265.
Court of Appeals of Georgia.
November 15, 2002.
Certiorari Denied February 24, 2003.
*434 Oliver R. Register, Atlanta, for appellant (case no. A02A1264).
Harold B. Baker, Valdosta, for appellant (case no. A02A1265).
Thurbert E. Baker, Atty. Gen., Dennis R. Dunn, Deputy Atty. Gen., William C. Joy, Senior Asst. Atty. Gen., Shalen S. Nelson, Laura W. Hyman, Asst. Attys. Gen., Charles R. Reddick, Homerville, for appellee.
BARNES, Judge.
The natural parents of C.M., E.M., and A.D.M. appeal the juvenile court's decision to terminate their parental rights. Because the appeals concern the termination of the parental rights to the same children and concern substantially the same issues, we have consolidated them for disposition.
In Case No. A02A1264, the father contends the juvenile court erred by failing to record the deprivation hearing, by denying his right to counsel in the earlier deprivation hearing, and by admitting and considering inadmissible hearsay. He also contends the evidence is insufficient to support the termination of his parental rights.
In Case No. A02A1265, the mother contends the juvenile court erred by admitting and considering inadmissible hearsay and by denying her right to counsel at the deprivation hearing. She also contends the evidence is insufficient to support the termination of her parental rights.
As we find no reversible error and the evidence supports the decision of the juvenile court, we affirm the termination of parental rights in both appeals.
Case Nos. A02A1264 and A02A1265
1. Both parents contend the trial court erred by not appointing counsel to represent them during earlier deprivation proceedings concerning the children. See OCGA § 15-11-6 ("Right to Counsel"). Neither parent, however, identifies where in the record a request for appointment of counsel because of indigence was made and denied by the juvenile court.[1]
More significantly, this is not the proper time to assert error in the deprivation proceedings. Deprivation proceedings and parental rights termination proceedings are separate and distinct. In the Interest of V.S., 230 Ga.App. 26, 31(2), 495 S.E.2d 142 (1997). Unappealed deprivation orders of the juvenile court may be used to establish that the children were deprived within the meaning of OCGA § 15-11-94(b)(4)(A)(i). In the Interest of A.M.B., 219 Ga.App. 133, 134, 464 S.E.2d 253 (1995). Because the parents did not appeal that decision regarding their children, they are bound by the determination that their children were deprived. See OCGA §§ 9-12-40; 9-12-42; In the Interest of J.L.Y., 184 Ga.App. 254(1), 361 S.E.2d 246 (1987). See also In the Interest of B.P., 207 Ga.App. 242, 244, 427 S.E.2d 593 (1993) (unappealed deprivation determination binding on appeal). Accordingly, the parents' enumerations of error concerning the denial of counsel at the deprivation hearing are not properly before us in this appeal.
2. Both parents also contend the juvenile court erred by admitting and considering a time line prepared by a Department of Family & Children Services ("DFCS") worker showing the history of DFCS's involvement with the family, because the time line was prepared from DFCS records and contained hearsay. Because the juvenile court found that the time line was a business record, it admitted the time line over the parents' objections. Pretermitting whether the time line was admissible under any other rule of evidence, this time line was not a business record. See OCGA § 24-3-14.
*435 This Code section allows the introduction of entries in business records when the entry was a recording of an act, transaction, occurrence, or event and the entry was made in the regular course of business to record such entries by someone acting according to that routine at or near the time of the act, transaction, occurrence, or event. OCGA § 24-3-14. This time line does not meet that standard.
The time line was prepared for this litigation and, thus, was not prepared in the regular course of business. Reach Out, Inc. v. Capital Assoc., 176 Ga.App. 585, 586(1), 336 S.E.2d 847 (1985). Also, because the time line was not prepared and maintained pursuant to a routine practice, it also failed to meet the requirements for admissibility as a business record. OCGA § 24-3-14(b); Lyerly v. Phillips, 188 Ga.App. 566, 569, 373 S.E.2d 663 (1988).
Nevertheless, we find harmless any error concerning the juvenile court's consideration of the time line as a business record, because the court said that it would not consider the hearsay. "The trial judge is presumed to know the law and to be capable of separating admissible grains of evidence from inadmissible chaff." Rowe v. Rowe, 195 Ga.App. 493, 494(2), 393 S.E.2d 750 (1990). Therefore, we assume that the juvenile court did not consider the inadmissible hearsay in reaching its findings of fact and conclusions. This assumption is reinforced by the failure of both parents to identify any particular finding of fact that was based on the hearsay they complain of in this enumeration of error. "We will not presume the trial court committed error where that fact does not affirmatively appear in the record. [Cit.]" Id. Appellants must show error in the record; arguments in briefs cannot be considered as they add no evidence to the record. In the Interest of C.S., 236 Ga.App. 312, 315(2), 511 S.E.2d 895 (1999).
3. Both parents also contend the evidence is not sufficient to support the juvenile court's decision to terminate their parental rights. The standard of review is whether, after viewing the evidence in a light most favorable to the appellee, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights should have been lost. In the Interest of J.H., 210 Ga.App. 255, 258(1), 435 S.E.2d 753 (1993). On appeal, this court defers to the trial court's factfindings and will affirm unless the appellate standard is not met. In the Interest of R.N., 224 Ga.App. 202, 480 S.E.2d 243 (1997).
The juvenile court concluded that the children were deprived because of the parents' neglect, the parents' failure to develop and maintain a meaningful parental bond with the children, the parents' failure to follow and complete the court-ordered case plan goals, and the parents' emotionally cruel and abusive conduct toward the children. Further, the court concluded that the cause of the deprivation would continue and not be remedied if the children were returned to their parents and would likely cause serious physical, mental, or emotional harm to the children.
Viewed in the light most favorable to the juvenile court's determination, the evidence shows that the children were ten, twelve, and thirteen years of age at the time of the hearing.[2] DFCS has been involved with the children for 13 years.
In 1991, the children were first placed in foster care because the father was in jail for writing bad checks and the mother could not be located. The children were returned to foster care the next year after the mother was arrested for driving without insurance, and the father doused himself and his trailer with lighter fluid and threatened to kill himself, brandished a knife, and consumed a handful of pills.
The children were placed in foster care again in 1998 when C.M. and E.M. were removed from the father's custody because he was acting irrationally and the mother brought A.D.M. to the DFCS office. The children have remained in foster care since that time.
*436 Several case plans were developed for the parents. The plans called for the parents to support and visit the children, obtain psychological evaluations, attend mental health counseling, learn parenting skills, learn coping skills, interact with the children appropriately, and secure adequate income and housing for the children. After DFCS determined that termination of the parents' parental rights was warranted, subsequent case plans primarily called for the parents to have contact with and support the children.
Testimony at the termination hearings showed that the father sporadically attended mental health counseling, failed to support the children, failed to complete parenting classes, did not interact appropriately with the children, and did not write the children as frequently as DFCS requested. The father testified and admitted not attending the parenting classes and missing mental health appointments. He also admitted making a bomb threat to blow up the DFCS office.
He further admitted that he was a convicted felon who was in prison three times for over twenty years in confinement, almost half of his life. The father was convicted for burglary, armed robbery, larceny, assault, criminal trespass, theft, and escape from prison. His last convictions were for forgery in 1992 and 1993. The mother also had prior convictions for accessory to murder, burglary, driving without insurance, criminal trespass, and deposit account fraud.
A caseworker testified that the mother also failed to comply with the case plan, that she had problems interacting with the children, and that she could not apply the knowledge she gained from the parenting classes. Because of her behavior, the mother's visits were closely supervised by DFCS personnel. Even though the children alleged that their stepfather had sexually abused them, the mother asked the children to tell the caseworker that they wanted to live with her and the stepfather. The mother did not support the children, and she did not send them birthday or Christmas cards.
A clinical psychologist, who had evaluated the parents, testified that the father has a dual diagnosis: primary psychopath and manic depression. He also testified that the father's IQ is in the superior range. According to the psychologist, unless the father is in a manic stage, he is able to parent, but when he is in a manic stage, his judgment is poor.
The psychologist testified that the mother had a long history of mental health problems. She has been diagnosed as alcohol dependent and a cannabis abuser, with post-traumatic stress disorder, borderline personality disorder, manic depression, and paranoia. The psychologist testified that the mother had an erratic lifestyle, inadequate parenting skills, and extremely poor judgment. In his view, she refuses to accept responsibility, blames others for her problems, is very self-centered, and views the children as her possessions. He also testified that he was concerned about her ability to keep the children safe.
The psychologist did not believe that either parent could adequately provide a home for the children and recommended long-term foster care for the children because he did not believe the children were adoptable. If long-term foster care was not an option, the psychologist would recommend termination of the parental rights. A DFCS caseworker, however, testified that long-term foster care is used only when a child cannot be adopted, and that she felt these children were adoptable.
Other witnesses testified about the children's mental health problems and their interaction with their parents. A social worker testified that the visits were chaotic and detrimental to the children's welfare, that one of the children was hospitalized twice with anxiety attacks after visits, and that the children became upset when they heard the father state that he did not want the children to live with him.
A nurse testified that she saw the children at least once a month over a period of three to four years, and that following visits by the parents, the children were hysterical. In her opinion, the parents' visits were harmful to the children. The nurse further testified that A.D.M. reported that the father physically abused her on several occasions. The children were concerned that they would be returned to the mother and the stepfather would abuse them.
*437 Also, a child and adolescent therapist testified that since January 1999 she has been treating C.M. and E.M. for sleep disturbances, nightmares, depression, and anxiety, and also treating C.M. for aggression toward her sisters. The therapist treated A.D.M. from 1999 to September 2000 for verbal and physical aggression toward others, homicidal and suicidal ideations, and self-abuse. A.D.M. has been diagnosed with bipolar disorder with psychotic features, intermittent explosive disorder, post-traumatic stress disorder, and chronic and borderline personality disorder. Because A.D.M. made so little improvement, she was moved to a residential treatment center, which was a more intense therapeutic environment.
The therapist testified that after visits with their mother, the children's behavior regressed, they had more temper outbursts, crying episodes, and panic attacks. The visits were ended after an incident in August 1999 when the father took the children to dinner and they met the mother and their stepfather. The father made the children promise not to tell that they met the mother and stepfather, and the mother told the children that if they told, they would be placed for adoption and it would be their fault. A.D.M. told the therapist that the father tried to choke her and that the parents told her that she was ugly and stupid and that they did not want her. The children also reported that the father did not feed them and that he drank alcohol. They also complained about being shifted by the parents from one parent to the other, and they were angry with their mother because she did not believe them when they said they were abused by the stepfather. She testified that the children loved their parents, but did not want to live with them. After the parental visitation stopped, the children made more progress in therapy.
Another therapist testified that the children told her that they did not want to return to their parents. One child said that she would be mad if her parents' parental rights were not terminated.
An adult mental health therapist testified that the mother began treatment with Behavioral Health Services in 1996, that he had treated her since 1999, and that she has been diagnosed with major depressive disorder, poly-substance abuse, and borderline personality disorder.
The father testified that he had complied with the case plans, except for parenting classes which he contended were not available in his area, was employed, had purchased a home, had sought mental health counseling, and received a mental evaluation. Also, the father testified that he paid child support through Social Security payments. The father, however, wrote the juvenile court in May 2000, stating his consent to the termination of his parental rights.
The mother also contended that she had made progress in satisfying the case plan by finding a job and completing a parenting class. She testified that she worked between 30 and 80 hours a week as a waitress at night. She admitted that she had made no offer of financial support for the children.
The mother also testified that the children were not molested by their stepfather while she was around. She contended that C.M. and A.D.M. were molested by a friend of her best friend. The mother and the stepfather were divorced in 2001.
The juvenile court earlier found the children were deprived and awarded temporary legal custody to DFCS.
Based on this evidence, we are satisfied that any rational trier of fact could have found by clear and convincing evidence that the parents' rights should have been terminated. In the Interest of J.H., supra, 210 Ga.App. at 258, 435 S.E.2d 753.
Case No. A02A1264
4. The father alleges that the juvenile court erred by not recording the deprivation hearings. As the termination determination is separate and independent of the deprivation decision, this allegation is without merit for the reasons stated in Division 1, above.
Judgments affirmed.
RUFFIN, P.J., and POPE, Senior Appellate Judge, concur.
NOTES
[1] The mother did testify as follows: "I didn't have an attorney; I didn't know I could object. I mean, I had an attorneyI mean, I asked for an attorney and didn't get one."
[2] E.M. was born February 15, 1991; C.M. was born December 25, 1988; and A.D.M. was born October 22, 1987.