A07A1042. IN THE INTEREST OF S. B. et al., children.
(651 SE2d 140)

JOHNSON, Presiding Judge.

This is an appeal from an order of the juvenile court terminating the mother's parental rights to S. B. and S. B., twin three-year-olds. The mother contends there was not clear and convincing evidence

---

[11] *Moody*, supra.
[12] (Citation and punctuation omitted.) *Brogdon v. State*, 270 Ga. App. 568 (1) (607 SE2d 199) (2004).
[13] Id.

that the past deprivation of the children was likely to continue or would not likely be remedied by the mother, there was not clear and convincing evidence that the continued deprivation would likely cause serious physical, mental, emotional or moral harm to the children, there was not clear and convincing evidence that the termination of parental rights was in the best interests of the children, and the juvenile court erred in denying her motion for new trial on the grounds of her nonattendance at the termination hearing and ineffective assistance of trial counsel. We find no reversible error and affirm the juvenile court's order terminating the mother's parental rights.

The evidence presented at the parental rights termination hearing revealed the following: On January 24, 2004, the Hall County Department of Family and Children Services (the "Department") received a report that the mother had been arrested for outstanding criminal warrants in Michigan. Following a deprivation hearing, the juvenile court found three-month-old S. B. and S. B.[1] deprived and placed them in the Department's custody. This order was not appealed. The juvenile court incorporated as part of its order a case plan requiring the mother to resolve her criminal charges, keep the Department apprised of her legal status, comply with her probation, obtain all available benefits, maintain stable employment and housing for six months, and provide written verification.

On June 21, 2004, the Department submitted a written family assessment, psychological evaluations of the children, and a relative search to the juvenile court. The family assessor reported that the mother had been arrested in 1998 for check fraud, was arrested in 2002 for embezzlement after stealing $3,000 in travelers' checks, went on the run from police, and was now awaiting sentencing in Michigan. The juvenile court subsequently found that the mother's incarceration negatively affected her relationship with the children and extended the Department's custody of the children. The court entered orders adopting updated case plans.

Following another deprivation hearing in December 2005, the juvenile court found that (1) other than a few phone calls, the mother had no bond or contact with the children in two years, (2) the mother had never contacted or appeared in the juvenile court, (3) the mother never requested an attorney, (4) the mother never paid any child support or sent any gifts to the children, and (5) the mother did not have sufficient income to support the children. The court further found that the children were doing well in their foster home and that

---

[1] Although the children are twins, DNA testing confirmed that the children had different fathers.

it was not in their best interests to be uprooted and sent to Michigan. That order was not appealed.

On February 6, 2006, the guardian ad litem recommended termination of the mother's parental rights, and the juvenile court conducted a review hearing where it specifically noted that the mother did not attend the hearing and failed to maintain meaningful contact with the children. The juvenile court subsequently appointed counsel to represent the mother and separate counsel to represent the children. The juvenile court also accepted the Department's diligent search for relative placement report.

On May 15, 2006, the juvenile court conducted a hearing on the termination petition. The mother did not attend the hearing, but she was represented by counsel. According to her attorney, the mother was on parole and needed permission to travel. The attorney stated that he informed her of the hearing date, but since that conversation the mother had moved; the letters sent by the attorney were returned and her last known phone number was disconnected.

A case manager for the Department testified that the children had been in the same foster home for the past three years. She further stated that the mother had been released from prison on May 18, 2005, but had not seen the children in over two years and failed to provide the children any support or maintain her relationship with the children. According to the caseworker, the mother called in April 2006 and provided a new address and job, but failed to verify her income in writing. The caseworker was unable to maintain contact with the mother and learned from the mother's parole officer that she had moved. The caseworker noted that the mother never made any attempts to attend any hearings, although she had her own car and relatives who could have helped her. While the caseworker suggested trying to transfer the mother's parole to Georgia, the mother did not want to leave her fiancé or live in a shelter while she looked for housing.

The caseworker opined that the children were still deprived, which was unlikely to change, they were suffering harm due to their mother's neglect, and termination of parental rights was in their best interests. According to the caseworker, it would be traumatic for the children to suddenly be reunited with their mother after a two-year absence, and the foster parents desired to adopt the children. The caseworker testified that a diligent search for relative placements was completed in March 2006 and that no suitable relatives were found. She recommended that the children remain with their foster parents.

The foster mother testified that the children were placed with her in January 2004. At first they developed respiratory viruses because the mother had not properly immunized them, but they were

now doing well and had bonded with her family. They called her and her husband "mama" and "daddy." The mother had called to speak with the children three times in the past two years and not at all since October 2005. While she was in prison, the mother sent only one letter, never sent birthday or Christmas gifts, and never paid any child support. The foster father also testified that he and his wife had bonded with the children and desired to adopt them.

The juvenile court accepted a written report from the court appointed special advocate for the children which indicated that the mother had no meaningful relationship with the children and that the children had bonded with the foster parents who desired to adopt them, and further recommended termination of the mother's parental rights. The children's attorney and guardian ad litem also recommended termination of the mother's parental rights and stated that such termination was in the children's best interests because of their need for permanency.

On June 15, 2006, the juvenile court entered an order terminating the mother's parental rights. The mother filed a motion for new trial, and the juvenile court conducted a hearing on the motion. The mother testified by telephone, explaining that she could not personally attend the new trial hearing because she had given birth ten days previously. She admitted spending 12 months in prison for embezzlement and that she was released in May 2005. At that point, she moved in with her mother. She moved three other times and currently lives with her fiancé, her seven-year-old son and her new baby. The mother acknowledged that she had four jobs since being released from prison in May 2005, that she was laid off from her last job in March 2006, and that she had been unemployed for more than four months. Her only current income was welfare assistance and food stamps, but she also received money from her fiancé.

According to the mother her only contact with the children since they were placed in foster care was 15 cards or letters while she was in prison and weekly calls after she was released from prison. She did not pay any child support, but argued that she was not court ordered to do so. The mother claimed she only learned in December 2005 or January 2006 that she could travel outside of Michigan, but she did not do so then because she was either working or did not have the money. She denied that she did not want to transfer her parole to Georgia because she would not leave her fiancé. Although she claimed she had obtained housing and employment, and completed drug abuse and parenting classes, she stated that she did not receive any written certificates and still needed to pay fines, restitution and parole fees.

According to the mother, she did not attend the termination hearing because she was waiting for the Department to transport her,

but she later testified she could not attend because she was not working, even though she owned her own car and her fiancé was employed. She admitted she had notice of the hearing and had been properly served. She conceded she never called her attorney about funding to travel to Georgia, but denied being uncooperative. She admitted she did not send any documents to her attorney because she was not asked to. She further complained that her attorney was not helpful and only spoke with her four times. The mother testified that she believed it was her caseworker's duty to transport her to the termination hearing and blamed her caseworker and her attorney for not getting any funding for her travel from the Department. She admitted she did not ask anyone for a loan to attend the hearing, even though she considered it very important to attend, and she never notified the juvenile court or her attorney that she could not attend. She also admitted she received a $1,200 tax refund in February 2006, but testified that she spent the money. Although the mother did not have any money to attend the termination hearing, she believed she could provide for the twins.

The mother's former attorney testified that she was appointed to represent the mother on January 25, 2006. She spoke with the mother and they accepted service of the termination petition. The mother told the attorney that she only sent the children one birthday card, a Christmas card, and possibly one letter. In addition, the attorney knew of only one phone call from the mother to the children. According to the attorney, she advised the mother that it was valuable to visit the children, and the mother never stated that she was restricted in traveling to Georgia.

Before the pre-trial hearing, the attorney sent the mother a letter, which was returned; the attorney also tried to call the mother but was unable to reach her. The attorney sent another letter to the mother advising her of the termination hearing and called her parole officer four times, but was unable to reach the mother. On May 23, 2006, the mother left the attorney a message with her new phone number, but the attorney still received no response with the new phone number. According to the attorney, the mother never asked the attorney to transfer her parole to Georgia or send the case to Michigan, never mentioned any financial issues in traveling to Georgia, never provided any relative sources, never asked for assistance to come to the termination hearing, and never advised that she could not attend the termination hearing. Although the attorney told the mother she would try to fund her travel to the termination hearing, she never made any promises or guarantees, and she did the best she could to get the funding.

The attorney knew that the mother was unemployed in May 2006, but did not know she had not worked since February 19, 2006.

She also only knew of two of the mother's four addresses. The mother never advised the attorney that she was having any difficulty contacting the attorney. According to the attorney, she listened to evidence and raised proper objections at the hearing.

The juvenile court denied the mother's motion for new trial, but gave her until September 25, 2006 to provide phone records to support her claim of frequent contact with the children. On October 16, 2006, after the mother had failed to produce any records, the juvenile court issued its final order denying the mother's motion for new trial. The mother appealed. We find no error and affirm the trial court's order.

1. The mother contends the juvenile court erred in denying her motion for new trial on the grounds of the Department's failure to follow through on obtaining travel funds for the mother's travel to the termination hearing, and the ineffective assistance of her trial counsel during the termination hearing. We find no error.

The Department submits that this enumeration of error is moot since (1) the juvenile court accepted new evidence at the motion for new trial hearing, including telephone testimony by the mother and exhibits that would have been presented at the termination hearing, (2) the mother was represented by new counsel during this hearing, and (3) the court gave the mother additional time after the hearing to produce documents supporting her claims. In fact, the juvenile court specifically stated it would grant the mother's motion for new trial if she produced documentation corroborating her claims of frequent telephone contact with the children, but the mother failed to produce the requested documentation. Nonetheless, we will address the mother's enumeration of error on the facts.

(a) The mother argues that she was unable to appear for the termination hearing because (1) she could not get permission from her Michigan parole officer to travel out of state, and (2) she relied on her caseworker's representation that the Department would assist the mother in obtaining funding for the trip. The trial court properly denied the mother's motion for new trial on both these grounds.

Although the mother indicates there was some difficulty or confusion in receiving permission from her Michigan parole officer to leave the state, the caseworker testified that she had a conversation with the mother's parole officer, and the parole officer informed her that the mother could get permission to leave the state and attend the termination hearing. And the mother never gave the caseworker any indication that she would be restricted in her travel or could not attend the termination hearing. In fact, the mother testified that she knew she could travel to Georgia, but had not done so to visit her children because of her job situation. And, the mother was aware that she could have moved to Georgia and transferred her parole, but

chose not to do so. Moreover, even if she were restricted in her travel, this restriction was solely due to her criminal activity and subsequent parole. The mother cannot complain about her absence at the termination hearing here because "that absence was the direct result of [her] criminal conduct in another state."[2]

The caseworker further testified that the mother never indicated she would need financial assistance to travel to the termination hearing, and the mother never asked the caseworker to assist her in obtaining funds for the trip. Although the caseworker suggested to the mother that funding might be available to help with her travel to the termination hearing, the caseworker never promised any funding. And, after making a few unsuccessful attempts to obtain funding, the caseworker called the mother two weeks prior to the termination hearing and told her that "if we were able to [assist her] then I would contact her." The issue never came up again.

Contrary to the mother's argument, the Department had no duty to assist the mother in traveling to the termination hearing.[3] The mother was responsible for making the necessary arrangements to attend the hearing, and she had over two months in which to make these arrangements. In addition, the mother owned a car and a valid driver's license, the Department offered her accommodations in a shelter while she was in Georgia, she was periodically employed and had received a $1,200 tax refund in February 2006, her fiancé was working full-time and their monthly income was over $2,000, and she never asked anyone for a loan. The fact that no funds were available through the Department does not relieve the mother of her responsibilities toward her children.

(b) The mother argues that her attorney provided ineffective assistance of counsel because this was her first termination case, she was difficult to contact, she did not develop any defenses at the termination hearing, and she did not request a transfer of the case to Michigan or a transfer of the mother's parole to Georgia. We find that the trial court properly denied the mother's motion for new trial on the basis of ineffective assistance of counsel.

In order to prevail on a claim of ineffective assistance of counsel, the mother must show that her counsel's performance was deficient and that absent counsel's unprofessional errors, the result of the trial would have been different.[4] The mother must overcome the strong presumption that counsel's performance fell within a wide range of

[2] See In the Interest of C. C. E., 246 Ga. App. 584, 585 (540 SE2d 704) (2000).

[3] See generally McKinney v. Jennings, 251 Ga. App. 18, 19 (553 SE2d 344) (2001) (the trial court has no obligation to make arrangements for an out-of-state prisoner to attend a termination hearing).

[4] See In the Interest of A. H. P., 232 Ga. App. 330, 334-335 (2) (500 SE2d 418) (1998).

professional conduct and that counsel's decisions were not made in the exercise of reasonable professional judgment.[5]

Here, the mother "does not deny that she failed to keep her appointed trial counsel advised of her circumstances prior to the hearing and that she therefore bears some responsibility for the lack of information being presented to the Court." In fact, trial counsel testified that she did not have any contact with the mother from February 10 until after the termination hearing on May 15, 2006. Although trial counsel attempted a number of times to contact the mother, the mother had moved and disconnected her telephone. Even the mother's caseworker testified that she never knew all of the mother's addresses, that she only learned from the mother's parole officer that she had moved, and the mother never complained about difficulty contacting her attorney until after the termination hearing had concluded.

In addition, the mother never informed trial counsel of any evidence or witnesses that would assist her defense. And, the mother never informed trial counsel or her caseworker that she would not be attending the termination hearing, even though trial counsel informed the mother of the importance of attending the termination hearing. As a result of the mother's failure to appear at the termination hearing, she was not able to testify about any progress she had made in compliance with her case plan, and trial counsel had no way to rebut the evidence presented to the court regarding the mother's lack of contact with the children. While it was the attorney's first termination case, the attorney had been admitted to practice since December 2002 and had handled deprivation and delinquency work. Furthermore, the mother has failed to produce any evidence showing that the attorney mishandled the case or that the fact that this was the attorney's first termination case in any way affected the outcome of the case.

The mother's attorney was also not ineffective for failing to request a transfer of the case to Michigan. "Because our law does not mandate transfer, failing to move for a transfer was not deficient."[6] And, according to the mother's caseworker, the mother knew she could transfer her parole to Georgia but chose not to, so trial counsel cannot be ineffective for failing to request a transfer of her parole to Georgia.

Additionally, the mother has failed to show that, but for counsel's alleged errors, her parental rights to the children would not have

---

[5] Id.

[6] See *In the Interest of K. M. L.*, 237 Ga. App. 662, 664 (3) (516 SE2d 363) (1999).

been terminated. Given the mother's lack of contact with the children, her lack of support for the children, and her unstable housing and employment history, it is probable that the outcome of the trial would have been the same regardless of trial counsel's efforts. This position is bolstered by the juvenile court's denial of the mother's motion for new trial based, in part, on the mother's failure to provide evidentiary support for her position that she remained in contact with the children. Contrary to the mother's assertions, the record shows that the mother never visited the children, even after she was released from prison, she only called them three times over a two-year period, she paid no child support, she had four jobs from July 2005 until February 2006 and was unemployed at the time of the termination hearing, and she lived in four different residences since being released from prison. Accordingly, the mother has not shown that she was denied effective representation and the trial court did not abuse its discretion in denying her motion for new trial.[7]

2. The mother asserts the juvenile court erred in finding clear and convincing evidence that the past deprivation of the children was likely to continue. According to the mother, her criminal history is limited to the one embezzlement felony and an earlier bad check charge, and her travel restrictions have been "the sole cause of the deprivation and inability to provide for the children's needs." The mother asserts that if the case is transferred to Michigan, most of the issues currently establishing deprivation would be resolved. We find no error in the juvenile court's finding that the children's deprivation was likely to continue.

In its order terminating the mother's parental rights, the juvenile court concluded that the mother "has established a pattern of instability, arrest and incarceration and lack of commitment to her children that has extended for years even prior to the birth of the twins and continues today." The juvenile court specifically noted that the mother had previously served time for a different fraud offense, had four children by four different fathers, left one child in Michigan while she fled arrest in that state and, following release from prison, slipped back into her old patterns of behavior: moving in with a boyfriend, having a child with him, leaving her other children in another state without any contact or support from her, and moving around without notice to anyone.

It is well established that a juvenile court may consider a parent's past conduct in determining whether conditions of deprivation are likely to continue.[8] Here, contrary to the mother's argument,

---

[7] See *In the Interest of A. H. P.*, supra at 335.
[8] See *In the Interest of T. B.*, 267 Ga. App. 484, 486 (1) (600 SE2d 432) (2004).

there was a wealth of evidence showing that her lack of proper parental care and control caused the children's deprivation, and, because she did not appeal the prior findings of deprivation, the mother remains bound by those findings.[9] Furthermore, the evidence at the termination hearing clearly demonstrated that the mother's imprisonment on felony charges had a demonstrable negative effect on the quality of the parent-child relationship.[10] And, despite the mother's argument to the contrary, a mother's failure to support her children, even in the absence of a court order directing her to pay a specific amount for the children's support, is compelling evidence that the mother is not an able parent.[11]

In addition, a mother's lack of involvement in her children's welfare supports a juvenile court's finding that the children's deprivation would likely continue if they are returned to the mother.[12] Here, as noted before, the record shows that the mother never visited the children from the time they were placed in foster care in January 2004 through the hearing on her motion for new trial on August 7, 2006. She only called the children three times over a two-year period, and she failed to pay any child support or provide for any of the children's needs since they were placed in foster care. This Court has held that an incarcerated parent's failure to support her children and to maintain a relationship with them constitute aggravating factors in support of termination of parental rights.[13] Here, the mother's inability to pursue her commitment to establish a familial relationship with the children is not the result of state action, but the result of her own criminal action.[14]

The mother also failed to comply with her case plan goals. She failed to maintain stable housing (moving four times in fourteen months), failed to obtain stable employment (she had four jobs from July 2005 until February 2006 and was unemployed at the time of the termination hearing), and failed to provide any documentation showing compliance with other case plan goals. She also failed to remain in contact with her attorney or the Department, failed to attend the termination hearing, and failed to provide documentation requested by the juvenile court after the new trial hearing. Although at the time of the new trial hearing the mother claimed to have completed a

---

[9] See *In the Interest of C. M.*, 258 Ga. App. 387 (1) (574 SE2d 433) (2002).

[10] OCGA § 15-11-94 (b) (4) (B) (iii); see *In the Interest of S. R. B.*, 270 Ga. App. 466, 470 (4) (606 SE2d 655) (2004).

[11] See *In the Interest of T. B.*, supra at 486-487.

[12] See id.

[13] See *In the Interest of J. K.*, 239 Ga. App. 142, 145 (1) (520 SE2d 19) (1999).

[14] *Turner v. Wright*, 217 Ga. App. 368, 369 (1) (457 SE2d 575) (1995).

number of her case plan goals, she failed to provide any documentation to support these claims. In addition, the mother argued that she called and wrote the children numerous times, but also was unable to substantiate these claims. "The decision as to a child's future must rest on more than positive promises which are contrary to negative past fact."[15] From the mother's past parental deprivation, the juvenile court was authorized to infer that the children's deprivation was likely to continue.[16]

3. The mother contends the juvenile court erred in finding clear and convincing evidence that the continued deprivation would likely cause serious physical, mental, emotional or moral harm to the children and that termination of her rights was in the best interests of the children. We find no error.

The same facts that support a juvenile court's conclusion that a child is deprived and that the deprivation is likely to continue if placed with the parent also support a conclusion that continued deprivation would likely cause the child serious harm and that termination of parental rights would be in the child's best interest.[17] As additional evidence in support of these factors, there was evidence that the children have been in foster care nearly their entire lives, they came into foster care with developmental delays due to parent neglect and transient lifestyle, they are thriving in their current circumstances, and they have bonded with their foster parents who desire to adopt them. The court appointed special advocate for the children, the attorney for the children, as well as the children's guardian ad litem all supported terminating the mother's parental rights.

It is well established that children need permanence of home and emotional stability or they are likely to suffer serious emotional problems.[18] Here, the children have been in the care of their foster parents since they were three months old. They are now nearly three years old, and have not seen their mother in over twenty-seven months. The mother's caseworker opined that the children were still deprived due to neglect, they were suffering harm, and that termination of the mother's parental rights was in the children's best interests.

The children should not have to remain indefinitely in the state's system, especially since they are living with foster parents who desire to adopt them. Considering the needs of the children, including the

---

[15] (Citations and punctuation omitted.) *In the Interest of R. N.*, 224 Ga. App. 202, 205 (2) (480 SE2d 243) (1997).

[16] *In the Interest of T. B.*, supra at 487.

[17] *In the Interest of K. A. S.*, 279 Ga. App. 643, 651 (1) (d), (2) (632 SE2d 433) (2006).

[18] *In the Interest of B. I. F.*, 264 Ga. App. 777, 781 (1) (592 SE2d 441) (2003).

214

need for permanence and stability, and the evidence of the mother's past parental misconduct, a rational trier of fact could have found clear and convincing evidence that the children would suffer serious harm if returned to the mother and that termination of the mother's parental rights was in the children's best interests.[19]

*Judgment affirmed. Phipps and Mikell, JJ., concur.*

DECIDED AUGUST 10, 2007.

*Harold M. Walker, Jr.,* for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Elizabeth M. Williamson, Assistant Attorney General, Franklin B. Patterson,* for appellee.

[19] See *In the Interest of K. A. S.,* supra at 652 (2); *In the Interest of T. B.,* supra at 489 (3); *In the Interest of B. I. F.,* supra at 781 (2).