**FIRST DIVISION**
**DOYLE, C. J.,**
**PHIPPS, P. J., and BOGGS, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**November 20, 2015**

# In the Court of Appeals of Georgia

A15A1427. IN THE INTEREST OF S. B. et al., children.

BOGGS, Judge.

The parents of five-year-old S. B. and six-year-old D. L. B. appeal from juvenile court orders terminating their parental rights and subsequent orders denying their motions for new trial. Specifically, the parents contend that the court lacked clear and convincing evidence to support its findings that deprivation was likely to continue and that continued deprivation would cause serious physical, mental or emotional harm to the children. The parents further assert that termination of their parental rights was not in the children's best interests and that they received ineffective assistance of counsel. We granted the parents' application for discretionary review, and, for the reasons explained below, we reverse.

The record shows that the mother and father have two children together out of wedlock, a daughter born in 2010 and a son born in 2009. The father was married to another, but he noted that he had been separated from his wife for 15 years and did not know her whereabouts so he could not divorce her. Although he never legitimated the children, he resided with the mother and children except when working in North Carolina to support them. DFACS became involved with the family in March 2011, when the Department substantiated allegations that the children had been neglected and were receiving inadequate food, clothing, shelter, and medical attention. The parents consented to court orders, entered on June 11, 2012, finding the children deprived but allowing them to remain in the parents' custody under a protective order that required the parents, among other things, to maintain sufficient income, provide adequate food, keep housing free of animal urine and feces, make and keep necessary medical and dental appointments, and take parenting skills training. In the orders, the parents stipulated that conditions in the family home were unsanitary and unsafe: old food and dirty dishes were piled in the sink and on the counters, dog feces was located throughout the house, including in the children's room, cigarette butts and piles of trash were located throughout the house, expired food remained in the refrigerator, and the house lacked electric power. Furthermore, the parents stipulated

that they failed on many occasions to take the children to scheduled doctor appointments and that the pediatrician would no longer provide well-baby checks for the children. The court orders were set to expire on November 23, 2012, unless sooner terminated by court order.

On July 25, 2012, the children were removed from their home and placed in foster care based on a new complaint that there was no electric service in the home during the summer heat, that D. B. had received severe sunburns on at least three occasions, and that the parents had failed to comply with the protective order: the parents had unstable housing, their home continued to be unsanitary, and neither parent had a steady income. The children again were found to be deprived after the 72 hour hearing, and on August 15, 2012, the parents stipulated to a deprivation finding based upon medical neglect (three untreated severe sunburns and a lack of up to date immunizations), inadequate supervision, inadequate housing, irregular employment, and general non-compliance with the protective order directives. The court orders were set to expire on July 25, 2013, unless sooner terminated by court order.

At a January 2013 judicial review, the court found that the parents had maintained a bond with the children by attending weekly visits, but that they needed

3

to obtain and maintain employment and stable, clean housing. The children remained in foster care, and the court revised the permanency order to a concurrent plan of reunification or adoption. On July 15, 2013, this plan was extended through July 25, 2014, unless sooner terminated by court order. In that consent order, the court noted that both parents had completed their parenting training, made virtually all scheduled visits with the children (even though they had to walk five miles to the visitation because they could not get a ride from family or friends), and maintained a bond with the children, but they still failed to maintain stable employment or housing.

On October 1, 2013, DFACS filed petitions to terminate the parents' parental rights. Since the father had not legitimated either child, he was informed that he would lose all rights to the children and would not be entitled to object to the termination of his rights if he did not file a petition to legitimate within 30 days. On the same day, the court appointed public defender Katie Parker as attorney for both the father and the mother.

The one-day termination of parental rights hearing occurred on December 10, 2013. At the outset, DFACS invoked the statutory provision of OCGA § 15-11-96 (i)[1]

---

[1] We note that this statutory provision was superseded on January 1, 2014 by OCGA § 15-11-283 (d), see Ga. L. 2013, p. 294 § 5-1, but it is undisputed that the old statute applies in this case.

extinguishing the rights of putative fathers to object to termination of their parental rights. Parker admitted that she failed to file a petition for legitimation on behalf of the father after being served with the termination of parental rights petition.

Beverly Oxley, a licensed psychologist, testified without objection at the termination hearing as an expert in child psychology. In October 2012, she performed separate two-hour evaluations of then three-year old D. B. and two-year old S. B. According to Oxley, both children had severe learning delays in their speech and needed a language-rich or stimulating environment. In addition, both children demonstrated symptoms of reactive attachment disorder, which is a disorder in which children are unable to form healthy attachments and need stability, consistency, and loving caregivers to form healthy attachments. Oxley opined that moving the children from foster home to foster home would put them at risk for developing reactive attachment disorder. However, she noted that the children's symptoms did not warrant therapy, though she did recommend speech therapy for the children.

Kim Ball, a social services case manager for DFACS, conducted parenting classes for the parents in conjunction with their weekly visits from October 2012 through March 2013. Ball testified that the parents were extremely cooperative and very interested in the training. In fact, they rarely missed their visits and often walked

five miles from their home to the visits. The father often got down on the floor with the children to play and had a lot of positive interaction. The mother, who claimed back problems prohibited her from playing on the floor, read to the children or played video games with them. According to Ball, the children were well-behaved during the visits, but she wished the mother were more engaged.

Paulette Turner, a DFACS parent aide, provided parenting education and observed visits from July 2013 through November 2013. She testified that the parents and the children were always happy to see each other, on visit days the children would "always" ask, "Are we going to see Mama and Daddy?" and at the visit's end "everybody just hugs and kisses and says,'Bye, see you next week.'" Turner, testified, however, that the children appeared to be happy to return to their foster home after visits. According to Turner, both parents were engaged in the visits, brought a bag with clean diapers and snacks to each visit, and occasionally brought the children crayons, colored pencils, or toys. The father had to stop visiting after he left to resume his old job in North Carolina.

Case manager Ashley Buchanan also noted the parents' remarkable visitation record, and she testified that the parents cooperated with home visits, phone calls, and mail. Regarding the mother, Buchanan testified that she regularly attended mental

6

health care counseling, cooperated with DFACS in home visits and phone calls, participated in parenting classes, and had no further medical issues with the children. The mother walked to various businesses seeking jobs, but had minimal success finding employment. And, although the house was cleaner than ever, there was still a bug problem and the housing situation remained unstable pending a move to Charlotte, where her husband had been rehired at the company where he worked for 23 years before being laid off in 2013. Buchanan also observed some visits with the children and agreed that the father demonstrated more parenting skills and nurturing behaviors than the mother, but acknowledged that the mother's passive parenting is more a difference in style than bad parenting. The parents had not paid any child support while the children were in DFACS custody.

The father testified that he had worked for 23 years as a tile and stone mason with the same company in North Carolina until the recession resulted in his layoff. He had recently been re-hired and was making $16.00 per hour working 40 hours a week. According to the father, he could not get off work on Wednesdays to see his children, and he wanted to transition them to Charlotte. Until then, the children and the mother could stay in the home he was renting through the money he was sending her.

The mother testified that in North Carolina the children were involved in a program called Babies Can't Wait. She contacted the program here in Georgia when they moved, and D. B. was started on speech therapy; S. B. did not need services at the time of the assessment. The mother noted that she had put out roach traps to eliminate the last of the bugs, had bagged old clothing, and had begun taking the dog outside so dog feces was no longer an issue in the house. She admitted that she previously was unaware of the dangers associated with dog feces, and she has scrubbed the floors and rugs in the house to get rid of the pet feces and odor. The mother admitted on two occasions to leaving the dog in the home with food and water without letting it out to relieve itself, but explained that on those occasions she had forgotten to give her brother a key to let the dog out. The mother described her parenting style as more watching and talking than doing, like her mother. She also acknowledged that she was in counseling, but had not been prescribed any medications. And she testified that when the family relocated to Charlotte she expected to find work because there was more work there and the bus only costs $2.00.

At the time of the hearing, the foster parents had four biological children living in their house, aged eight to nineteen, and the mother of the foster mother. According

to the foster mother, S. B. and D. B. are very affectionate, have improved a lot while under their care, and the foster parents are willing to provide a "forever home" to the children.

The guardian ad litem testified that the parents "have demonstrated . . . their commitment, their love for their children through their visitations that took some strenuous efforts on their part." However, he still recommended termination based on the parents' inability to provide safe, stable housing and to demonstrate learned parenting skills.

Following the hearing, the juvenile court noted that the parents have worked "really hard," and he has never had anybody come to court and say they've walked five miles for a visit. However, the court found "a general inability" on the part of the parents that will emotionally harm the children, and, therefore, the court found the children deprived. The court cited the foster parents' care, adequate transportation and finances, and "importantly" the fact that the foster parents were willing to adopt the children as support for its finding that termination of parental rights was in the children's best interest. In its written orders, prepared by DFACS, the juvenile court found that DFACS had met the requirements for terminating the parents' rights and that termination of the parents' rights was in the children's best interests. The orders

stated that although the father had secured employment in North Carolina, he had not maintained the employment for a sufficient length of time to insure that he can provide financially for the children. The orders further noted that the father's failure to legitimate the children within 30 days from the notice provided for in OCGA § 15-11-96 required termination of his parental rights. See *In the Interest of T. B. R.*, 304 Ga. App. 773, 786 (4) (697 SE2d 878) (2010) (father who fails to legitimate lacks standing to challenge termination).

The parents filed motions for new trial. On July 12, 2014, prior to a hearing on the motions for new trial, the foster father died suddenly. The parents then filed amended motions for new trial and motions to set aside the judgment based on this changed circumstance and their assertion that their attorney had rendered ineffective assistance by failing to file a legitimation petition for the father.

At the August 5, 2014 motions hearing, the caseworker testified that the children spent six days in another home following the foster father's death, and the foster mother was trying to determine if she could still adopt them as a single mother of four children, but had not made a final decision. In addition, the father's attorney testified that she knew the parents were not married and realized a few days before trial that she should have filed a petition to legitimate, but failed to do so. She bore

10

sole responsibility for failing to file the petition, noting there was nothing strategic in not filing and no benefit to the father in not legitimating. The juvenile court nonetheless denied the motions for new trial or to set aside.

1. The parents assert that the trial court erred in terminating their parental rights because there was no clear and convincing evidence that deprivation was likely to continue or to cause serious harm to the children, and the evidence failed to show that termination was in the children's best interests. "On appeal from a juvenile court's decision to terminate parental rights, we review the evidence in the light most favorable to the court's decision and determine whether any rational trier of fact could have found by clear and convincing evidence that the parental rights should be terminated." (Citation and punctuation omitted.) *In the Interest of C. S.*, 319 Ga. App. 138, 139 (735 SE2d 140) (2012). "We do not weigh the evidence or resolve credibility issues, but merely determine whether a rational trier of fact could have found by clear and convincing evidence that the natural parent's right to custody should be terminated." (Citation and footnote omitted.) *In the Interest of K. A. B.*, 285 Ga. App. 537, 537 (646 SE2d 736) (2007). However,

> [w]e proceed in a termination case with the knowledge that there is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship. It must be

11

> scrutinized deliberately and exercised most cautiously. The right to raise one's children is a fiercely guarded right in our society and law, and a right that should be infringed upon only under the most compelling circumstances.

(Citations and punctuation omitted.) *In the Interest of C. A.*, 316 Ga. App. 185, 189 (728 SE2d 816) (2012); see also *In the Interest of C. S.*, supra, 319 Ga. App. at 144-145 (1).

As a threshold matter, we must determine whether to apply the new or old juvenile code. The new juvenile Code, which became effective on January 1, 2014, applies to those juvenile proceedings commenced on or after that date. See Ga. L. 2013, p. 294 § 5-1. Thus, although the termination order in this case was entered in March 2014, the old Code applies because the deprivation petition was filed in October 2013. See *In the Interest of F. A. G. R.*, 328 Ga. App. 88, 89 n.1 (761 SE2d 512) (2014).

Under the old Code, a termination of parental rights case involves a two-step analysis. First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the children are deprived; (2) the lack of proper parental care or control is the cause of their deprivation; (3) the cause of their deprivation is likely to continue; and (4) continued deprivation is likely to cause

12

serious physical, mental, emotional, or moral harm to the children. See former OCGA § 15-11-94 (b) (4) (A) (i)-(iv). If these four factors are found to exist, then the juvenile court must ascertain whether termination of parental rights is in the best interest of the children, considering their physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home. See *In the Interest of A. G.*, 293 Ga. App. 383 (667 SE2d 176) (2008).

Here, there were no allegations of physical abuse, drug use, or criminal conduct. In fact, the juvenile court and DFACS employees all commended the parents on their remarkable visitation record and their cooperation with home visits, phone calls, and parenting classes. The children were excited about visits and well-behaved during the visits, and, although the mother did not engage with the children as well as she could have, at least one DFACS employee testified that her actions may have represented a different parenting style rather than bad parenting. Granted, the parents were slovenly and poor, but other than general statements that filth is dangerous, DFACS presented no evidence that the squalid living conditions posed a threat to the children or that the children were unhealthy or sick due to the unsanitary conditions. Furthermore, the evidence showed that the parents' living conditions were improving. The parents were educated regarding the issues with dog feces and had taken steps

to rectify the problem, and the parents were attempting to resolve the roach infestation. The parents' home may not have been perfect, but it was cleaner than ever, and the father had been re-hired by the company for which he had worked for 23 years.

It is well-settled that "[a] court is not allowed to terminate a parent's natural right because it has determined that the child might have better financial, educational, or even more advantages elsewhere." (Citation, punctuation, and footnote omitted.) *In the Interest of D. L. T. C.*, 299 Ga. App. 765, 769 (1) (684 SE2d 29) (2009). "This is not a case where the 'evidence' consisted of merely 'positive promises' from the parent[s] that [they] would change and rectify past failures so as to avoid termination of [their] parental rights, and the juvenile court appears to have prematurely discounted the [parents'] progress toward meeting their goals." *In the Interest of C. J. V.*, 323 Ga. App. 283, 287 (746 SE2d 783) (2013). Given the steps the parents took to maintain contact with their children, their improvement during the time they worked with DFACS, and the father's recent re-employment with his former long-term employer, the juvenile court likely erred in finding clear and convincing evidence that any deprivation was likely to continue.

14

Moreover, even if the evidence was sufficient to show that deprivation was likely to continue, we have expressed concern and urged caution, noting that it is not automatically true that a finding that deprivation is likely to continue will support a finding that continued deprivation will harm the child: "The [parents'] inability to care for [their] children does not necessarily mean that [their] current relationship with them is detrimental." *In the Interest of D. F.*, 251 Ga. App. 859, 862 (555 SE2d 225) (2001). Here, the juvenile court found, "The [children] had already suffered harm as a result of the parents' actions, and the Court can just presume that the child would be subject to a likelihood of further harm by being returned to the custody of the parents." It does not appear that the court considered maintaining the status quo to provide the parents additional time to show an improvement in their living conditions and ability to parent, even though the father presented evidence that he had been re-hired by his former employer and was working full time at twice the minimum wage, which would improve their living conditions.

Furthermore, while there was testimony that the young children had experienced some developmental delays and showed some symptoms of reactive attachment disorder, they were not diagnosed with this disorder and were not receiving any counseling other than speech therapy, which the mother had begun with

15

one of the children before moving to Georgia. Although the parents may have poor parenting skills and live in less than admirable circumstances, there is nothing in the record to show that continuing the legal relationship of parent and child is inherently harmful to the children. See *In the Interest of D. F.*, supra.

This is especially true in light of the foster father's recent death. Termination of parental rights at the present time could seriously harm the children and cause further symptoms of reactive attachment disorder given the absence of a foster father and the foster mother's expressed concern that adoption of the children may no longer be an option for her. The juvenile court stated that it "cannot legally consider" evidence of the foster father's death or the father's re-hire with his old employer as a basis for a motion for new trial or motion to set aside the judgment of the court because it "must consider the evidence that was available at the time of the trial of the matter." However, evidence of the father's re-hire was in the record at the time of the trial. In addition, the juvenile court misinterpreted the two cases upon which it relied.

In *In the Interest of K. C.*, 249 Ga. App. 680, 681 (1) (549 SE2d 737) (2001), this Court noted in dicta that "we know of no statute or court rule that permits a de novo evidentiary hearing to be held on [motion for] reconsideration." In *In the Interest of C. M.*, 282 Ga. App. 502, 507-508 (3) (639 SE2d 323) (2006), we found

16

that a trial court did not abuse its discretion in declining to admit irrelevant evidence during a hearing on a motion for new trial when the new evidence did not change the circumstances supporting termination. Neither of these cases hold, as a matter of law, that a juvenile court is precluded from exercising its discretion to consider additional evidence on a motion for new trial if circumstances require such consideration. Given a juvenile court's plenary authority to modify its order based on changed circumstances, the trial court abused its discretion as a matter of law in refusing to consider the impact of the foster father's death and the father's recent re-employment in its ruling on the parents' motion for new trial. See, e. g., *In the Interest of A. M.,* 324 Ga. App. 512, 516 (3) (751 SE2d 144) (2013) (juvenile court may set aside or modify decision if newly discovered evidence or changed circumstances require in best interest of child); *In the Interest of J. N. F.*, 306 Ga. App. 313, 315 (701 SE2d 925) (2010) (juvenile court may change, modify, or vacate order on ground that changed circumstances require in best interest of child).

In the instant case, the evidence is not clear and convincing, at least at this time, that the deprivation is likely to continue, that continued deprivation will seriously harm the children, or that termination of the parents' parental rights is in the best interests of the children. "While we are reluctant to reverse the juvenile court's

17

determination, no judicial determination is more drastic than the permanent severing of the parent-child relationship." (Citation and punctuation omitted.) *In the Interest of A. A.*, 252 Ga. App. 167, 173 (2) (c) (555 SE2d 827) (2001). Termination of parental rights "is a remedy of last resort." *In the Interest of C. S.*, supra, 319 Ga. App. at 148 (1). Accordingly, we reverse the juvenile court's order.

2. The parents also contend that the trial court erred in denying their motion for new trial because trial counsel's failure to file a legitimation petition rendered her assistance ineffective. Because the issue of the father's failure to timely legitimate the children may arise upon any retrial of the case, we address it here.

"[T]he right to the custody and control of one's child is a fiercely guarded right in our society and in our law. It is a right that should be infringed upon only under the most compelling circumstances." (Citations, punctuation, and footnote omitted.) *In the Interest of H. S.*, 285 Ga. App. 839, 843-844 (648 SE2d 143) (2007). Accordingly, we have recognized that a parent has a right to effective assistance of counsel in defending against a termination petition. See *In the Interest of S. N. H.*, 300 Ga. App. 321, 329 (5) (685 SE2d 290) (2009).

> In order to prevail on a claim of ineffective assistance of counsel [the father] must show that [his] counsel's performance was deficient and that the deficient performance was prejudicial to [his] defense. To meet

the first prong of this test, [the father] must overcome the strong presumption that counsel's performance fell within a wide range of professional conduct and that counsel's decisions were [] made in the exercise of reasonable professional judgment. The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the circumstances of the case. The second prong requires [the father] to show there is a reasonable probability that, absent counsel's unprofessional errors, the result of the trial would have been different.

(Citations and punctuation omitted.) *In Interest of A. H. P.*, 232 Ga. App. 330, 334-335 (2) (500 SE2d 418) (1998).

Here, the evidence presented by the parents at the hearing on the motion for new trial meets this standard. Under the old Code, a non-legitimated father lost all rights to his children and was not allowed to object to the termination of his parental rights. Former OCGA § 15-11-96 (h) and (i). Termination of his parental rights was mandatory.[2] *In the Interest of T. B. R.*, supra, 304 Ga. App. at 786 (4); *In the Interest of D. W.*, 264 Ga. App. 833, 834-835 (1) (592 SE2d 679) (2003). Trial counsel for the parents in this case took responsibility for failing to file a legitimation petition and noted that this failure was due to oversight on her part and not to any trial strategy or reasonable professional judgment. Given that the failure resulted in the father's

_____

[2] The new Code now gives the juvenile court discretion whether to terminate the parental rights of non-legitimated fathers. OCGA § 15-11-283 (b).

19

inability to challenge the termination of his parental rights, the first prong of the test clearly is met. See *In the Interest of T. B. R.*, supra.

Regarding the second prong, the juvenile court stated that it would have terminated the father's parental rights on grounds that were not impacted by the failure of the father's counsel, and thus the father is unable to establish prejudice. However, under the old Code, the juvenile court had no authority to consider any basis other than the father's lack of standing to terminate his parental rights. See *In the Interest of T. B. R.*, supra, 304 Ga. App. at 786 (4); *In the Interest of D. W.*, supra, 264 Ga. App. at 834-835 (1). And, given the father's unusually persistent efforts to maintain his relationship with his children, his obvious bond and positive interaction with the children, his recent re-employment with the company for which he had worked for 23 years, and DFACS's failure to show either continued deprivation or that such deprivation would likely cause serious harm to the children, the father has shown there is a reasonable probability that, absent counsel's unprofessional errors, the result of the trial would have been different.

Based on trial counsel's ineffective assistance of counsel, we remand the case with direction that the father be given 30 days from the date of this order to file a

petition to legitimate the children or an acknowledgment of legitimation consistent with the provisions of the old Code.

*Judgment reversed and remanded with direction. Doyle, C. J., and Phipps, P. J., concur.*