**FIRST DIVISION**
**DOYLE, C. J.,**
**PHIPPS, P. J, and BOGGS, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**March 2, 2016**

# In the Court of Appeals of Georgia

A15A2017. IN THE INTEREST OF M. M. R., a child.          DO-098

A15A2018. IN THE INTEREST OF D. J. T., a child.          DO-099

DOYLE, Chief Judge.

These related appeals from the juvenile court's termination orders involve an extended family in which the biological grandmother, who is also the adoptive mother of D. J. T., was caring for D. J. T., , M. M. R., and three other grandchildren when they were removed from her care by the Department of Family and Children Services ("the Department").[1] M. M. R.'s mother ("the mother," who is neither the biological

---

[1] This Court granted the mother's application for discretionary appeal on February 3, 2014, and we granted the grandmother's motion for reconsideration of the denial of her application for discretionary appeal on April 1, 2014, allowing her appeal to proceed as well. After docketing, the cases were remanded on March 27, 2015, to the juvenile court for completion of the appellate record, and they were re-docketed in this Court on June 24, 2015. To the extent that either of the termination orders rule on the parental rights of parties other than the mother and the

nor legal mother of the other four children and who is the grandmother's biological daughter) was incarcerated at the time six-year-old M. M. R., eight-year-old D. J. T., and the three other children were taken into care. Because many of the pertinent facts overlap, we have consolidated the cases for purposes of the appeals.[2]

In Case Number A15A2018,[3] the grandmother appeals the trial court's order terminating her parental rights to D. J. T., arguing that the trial court erred by granting the petition to terminate because it lacked clear and convincing evidence to support a finding (1) of present deprivation; (2) that the cause of the deprivation is likely to continue; (3) that a present deprivation would cause serious mental, physical, emotional, or moral harm to the child; (4) that termination was in the best interests

---

grandmother, those rulings were not appealed to this Court, nor were the termination of rights as to the three other children taken into the Department's custody. Based on our review of the record, neither the mother nor the grandmother had legal rights to those three children.

[2] Georgia's former Juvenile Code applies to this case because it commenced in 2013. See generally *In the Interest of G. R. B.*, 330 Ga. App. 693, n. 1 (769 SE2d 119) (2015) (explaining that the new Juvenile Code applies to juvenile proceedings commenced on or after January 1, 2014, and describing changes made by new Juvenile Code pertaining to deprivation proceedings).

[3] Because the majority of the facts surrounding the deprivation occurred while the children were in the grandmother's care, we address her appeal first.

of the child; and (5) that she failed to support the child pursuant to former OCGA § 15-11-94 (b) (2).

In Case Number A15A2017, the mother appeals the trial court's order terminating her rights to M. M. R., arguing that the trial court erred by granting the petition to terminate because it lacked clear and convincing evidence to support a finding (1) of present deprivation; (2) that the cause of the deprivation is likely to continue; (3) that a present deprivation would cause serious mental, physical, emotional, or moral harm to the child; (4) that termination was in the best interests of the child; and (5) that she failed to support the child pursuant to former OCGA § 15-11-94 (b) (2).

For the reasons that follow, we reverse the termination orders in both cases.

> On appeal from a juvenile court's decision to terminate parental rights, we review the evidence in the light most favorable to the court's decision and determine whether any rational trier of fact could have found by clear and convincing evidence that the parental rights should be terminated. We do not weigh the evidence or resolve credibility issues, but merely determine whether a rational trier of fact could have found by clear and convincing evidence that the natural parent's right to custody should be terminated. However, we proceed in a termination case with the knowledge that there is no judicial determination which has more drastic significance than that of permanently severing a natural

parent-child relationship. It must be scrutinized deliberately and exercised most cautiously. The right to raise one's children is a fiercely guarded right in our society and law, and a right that should be infringed upon only under the most compelling circumstances.[4]

The record shows that in 2011 the grandmother and mother made plans to move from Fairview, Tennessee, to Georgia to care for an elderly family friend. By March 2012, however, the mother had been incarcerated, and the grandmother made plans to move to a rental home in Talmo, Georgia, with her adult son, his wife, and the grandmother's five grandchildren, including D. J. T., M. M. R., and three others for whom she was caring but had no formal parental rights except for D. J. T., her adoptive son.[5] After arriving to the area with their belongings and checking into a hotel to await some final repairs to the home, they were told by the landlords that the landlords had decided not to rent the house, and the landlords failed to return all of the grandmother's pre-paid rent and security deposit. At that point, the grandmother

---

[4] (Citations and punctuation omitted.) *In the Interest of S. B.*, 335 Ga. App. 1, 6 (1) (780 SE2d 520) (2015).

[5] According to the grandmother, and it is undisputed, she raised D. J. T. since he was ten months old and legally adopted him at age eight.

and her adult son and daughter-in-law[6] moved with the children into a tent in an Effingham County campground. The grandmother contended that she went to the Department to get assistance, but before she received a response from them, she called police to report that her adult son was stealing her belongings. The officer stated that he would contact the Department on her behalf to meet with her the next day about assisting the family. The deprivation order states that the Department discovered the children and grandmother after receiving reports of unsupervised children playing near a lake at the campground.

When a caseworker arrived at the scene, the conditions of the children showed evidence of neglect, including soiled undergarments and dried feces on the younger children, and the grandmother was "not responsive" to the caseworker's attempts to rouse her.[7] The children were taken into shelter care at that time, and on April 27, 2012, nunc pro tunc to April 16, 2012, the juvenile court entered an order finding the children deprived based on lack of supervision/neglect and educational neglect because D. J. T. and an older child were not enrolled in school.

---

[6] It is unclear whether any of the children were the offspring of the adult son and daughter-in-law, who are not parties to this appeal.

[7] There is no discussion of where the adult son or daughter-in-law were at that time.

The Department prepared a case plan as to the grandmother with regard to D. J. T., requiring that she (1) complete parenting education; (2) maintain a source of income; (3) maintain stable, appropriate housing; (4) complete a psychological evaluation; (5) submit to a drug and alcohol assessment and follow any recommendations therefrom; and (6) document any medically necessary prescriptions.

The record does not contain a case plan for the mother to reunify with M. M. R. prior to one dated April 5, 2013,[8] but that plan states that she must (1) remain out of jail; (2) complete a home evaluation and assessment; (3) submit to a drug and alcohol assessment and follow any recommendations therefrom; (4) have clean drug screens; (5) maintain a bond with M. M. R.; and (6) complete a psychological evaluation. The case plan notes that while the mother had been incarcerated she had corresponded with M. M. R., and it noted that she expressed interest in working on her case plan since her release.

On April 3, 2013, the Department filed a petition to terminate the grandmother's parental rights as to D. J. T. The petition reiterated the circumstances of D. J. T. at the time he and his cousins were taken into custody at the campground,

---

[8] This plan is dated 2 days after the Department filed its termination petition and only 36 days after the mother's release from jail. It refers to earlier plans, but these do not appear in the record.

and it alleged that the grandmother had "made little progress with her case plan." The Department contended that the grandmother had not (1) completed parenting classes, (2) supported D. J. T., (3) provided proof of stable income or housing, (4) provided proof of alcohol or prescription drug evaluation, (5) followed up with her psychiatrist, or (6) visited consistently with D. J. T. in the year he was in Department custody. The case plan stated that the reasons D. J. T. came into custody were inadequate housing and neglect based on living in the campground. The Department contended that in November 2012, the grandmother was evicted from a home in Georgia, and in December 2012, she moved back to Tennessee. Department caseworkers testified that between the March 2012 removal of the children and the grandmother's December 2012 move to Tennessee, she had made minimal progress toward her plan goals.

On April 3, 2013, the Department also filed a petition to terminate the mother's parental rights as to M. M. R. The petition reiterated the circumstances at the time M. M. R. and her cousins were taken into custody in March 2012, and it alleged that the mother had "made little progress with her case plan." Immediately after that sentence, the petition stated that the mother had "made no progress on her case plan." The petition acknowledged that the mother was incarcerated nearly the entire time between M. M. R.'s initial deprivation and the April 2013 petition to terminate, and

it also acknowledged that she took parenting classes while in prison and consistently corresponded with M. M. R. The petition contended that the mother had not completed a psychological exam or drug and alcohol assessments, and it contended that she failed to support M. M. R.

At the December 2013 termination hearing, the grandmother testified that in January 2012, prior to the mother's release from prison, she moved to a home in Smithfield, Tennessee. The grandmother, after having had no income for eight months, began receiving permanent disability payments of $3,500 a month[9] and maintained health insurance on all five of the grandchildren throughout the pendency of the Department's custody. After the mother was released from prison on February 27, 2013, she moved to Tennessee and lived with the grandmother; she obtained a full-time job, which she still held at the time of the termination hearing in December 2013. Both the grandmother and the mother visited weekly by phone with D. J. T. and M. M. R. respectively, only missing occasionally because of foster parent scheduling or poor phone connections, making up the missed sessions later. The grandmother

_____

[9] The grandmother previously was a nurse for the Department of Veterans Affairs. She stopped working in 2011 when she had a devastating neck and back injury, after which she retired on disability. Her disability payments did not begin until February 2013.

admitted that she had few in-person visits with the children because the visits were costly and time intensive (approximately ten hours of travel one way) for the one- to two-hour visits they were allowed. The grandmother stated that although in the past she had arguments with the mother, the mother had stopped using narcotics, was attending Narcotics Anonymous, and was "doing wonderful[ly]."

The grandmother contended that she had completed every portion of her case plan, doing some in Georgia and some in Tennessee. She admitted she had not paid child support, but contended the Department told her she would receive notification of an amount, which was never provided.

The mother testified that she was incarcerated in February 2012 for forging checks, at which point M. M. R. went to live with the grandmother. The mother was released from prison on February 27, 2013. The mother admitted that she had gotten into arguments with her mother, but since she stopped using drugs, their relationship had improved substantially. The mother stated that she had completed her case plan, including parenting classes, psychological evaluation, alcohol and drug evaluation, and housing approval. She testified that after starting employment in April 2013, she was currently a crew trainer at a fast food restaurant and was going to take management classes soon for a better position as well as start college classes later in

the year. The mother had given birth to another child shortly before going to prison, and she had custody of this child without any reported instances of abuse or neglect. She stated that she had asked the Department at least twice about child support payments, and she was told that "they would get back to [her] about it." The mother stated that she already had a bond with M. M. R., and she maintained it via weekly phone calls, which she only missed because of bad reception and which she always made up at later times; she testified that she loved M. M. R. and felt she could parent her properly. The mother admitted that she had abused prescription medication, which led to her check forgery and to arguments with the grandmother, but she testified to having made many changes in her life and taken control of her issues.

The Department caseworker testified that the grandmother and mother had completed the steps in their case plans but because the two were out of state, the caseworker could not observe that the grandmother would be able to parent D. J. T. or that the mother would be able to parent M. M. R. The Department caseworker only observed one in-person visit between M. M. R. and the mother, and testified that

> [M. M. R.] was excited to see her mother. She knew who she was. They talked about books and things. It seemed to be — I think because they had been — not — M. M. R. had not seen her for a very long time, it

10

was more of — she had a good visit, but it was more like friends than a mother daughter visit.

The caseworker admitted that the Department had not put a child support order in place, and she did not state whether the Department ever asked the mother or grandmother to provide an amount certain to a place certain in order to fulfill the requirement that they pay child support. When asked whether D. J. T. would still be deprived if returned to the grandmother, the caseworker responded that "I believe he would based on the fact that I — I can't testify to the fact, I don't know if [the grandmother] has ultimately changed by checking certain things off on her case plan. I'm not sure if the reasons why he came into care are no longer present." When asked whether M. M. R. would continue to be deprived, the caseworker testified that "I could not [say she would not be deprived] for the same reasons, I haven't been able to see any [parenting interaction, bonds, everything] throughout, since I guess March or when [she] moved to Tennessee." The caseworker testified it was in the best interests of D. J. T. or M. M. R. to have the grandmother's and mother's parental rights terminated, but she did not explain why. The caseworker contended that she was not sure if the mother understood M. M. R.'s needs having not parented her for two years.

11

The Court-Appointed Special Advocate ("CASA") testified that she recommended terminating the parental rights of the grandmother and the mother. When asked why she recommended this as to D. J. T., she stated that he needed "stability." The CASA acknowledged that much of the reason for the grandmother's problems working on her case plan during 2012 were because she had surgery and she had been traveling between Tennessee and Georgia to care for her dying father, resulting in "the kids . . . not [being] a top priority." The CASA was not aware that D. J. T. had any problems, until recently when his foster home gained another foster child and he began experiencing behavioral issues. The CASA stated that if the court decided to give custody of M. M. R. and D. J. T. to the mother and grandmother respectively, the children "will be okay."

Regarding M. M. R., the CASA testified that she had made a lot of improvements, and if she is moved to the mother's home "the entire family will need a lot of support for th[e] adjustment." She also testified that since the mother

> has been out of prison[,] she has taken all of my suggestions. There were some things early on with conversations between her and [M. M. R.] that might not have always been positive in the right direction and [M.M.R.] had some issues after those were over[,] and I gave her some suggestions and she has always followed those, and I really think she —

that she wants to and would do what's best for [M. M. R.], but I don't think that she really understands how severe her needs are at this time.

M. M. R.'s foster mother, who has three other children in her home, testified that the child had very violent temper tantrums, and she described her emotional development as "pre-infant level." She also testified that M. M. R. would defecate in her underwear since moving into their home, and then she would hide the soiled undergarment somewhere in her room or other places in the home. The foster mother testified that she believed in the month that M. M. R. lived in the tent, she began holding her feces, which lead to a distended bowel — an issue that they were working on with a gastrointestinal specialist.[10] The foster mother testified that M. M. R. stole things at school, and she would lie about it, was very clingy, and had nightmares, but these issues had gotten better since being in the home.

The grandmother testified that M. M. R. did not have issues with wetting or soiling her clothing and then hiding it or with temper tantrums when M. M. R. was in her care, and the mother stated that M. M. R. did not have issues aside from normal nighttime bed-wetting prior to going into State custody.

---

[10] No expert testimony was provided to support the foster mother's theory that this was a result of the stay at the campground.

On January 2, 2014, the trial court granted the Department's petition to terminate the grandmother's parental rights as to D. J. T. In its order, the court found that both the guardian ad litem and CASA submitted reports recommending termination of parental rights, but provided no indication of what information those reports might contain.[11] The juvenile court found that "evidence at the termination hearing was nearly identical to the evidence at the deprivation hearing and at every review hearing conducted by this [c]ourt." It also found that the grandmother had visited "sporadically" with D. J. T. such that Department caseworkers could not conclude whether the grandmother was parenting appropriately, and the grandmother had not completed her case plan. The court found that after moving to Tennessee in December 2013, the grandmother had not exercised all the available in-person visitation available with D. J. T., and thus, had failed to maintain a bond with him. The court also found that the grandmother had not supported the child as contemplated by OCGA § 15-11-94 (b) (2).

Under the previous Juvenile Code, a two-step process was utilized

---

[11] Neither of these reports appear in the record, and the bulk of the testimony by the CASA in support of termination centered on two of the younger children who were in the grandmother's care but for whom the grandmother had no parental rights.

14

in termination of parental rights cases. First, the [juvenile] court determine[d] whether there [was] present clear and convincing evidence of parental misconduct or inability. Four factors [were required] to establish parental misconduct or inability: (1) the child must [have been] deprived; (2) the lack of proper parental care or control by the parent in question must [have] cause[d] the deprivation; (3) the cause of the deprivation must [have been] likely to continue; and (4) continued deprivation must [have been] likely to cause the child serious physical, mental, emotional, or moral harm. If the [juvenile court found] that th[o]se four factors exist, then the court determine[d] whether termination of parental rights [was] in the best interest of the child, after considering the physical, mental, emotional, and moral condition and needs of the child, including the need for a secure and stable home.[12]

1. (a) *Deprivation.* The grandmother did not appeal the juvenile court orders finding D. J. T. to be deprived. While that failure to appeal often means that a parent is bound by the previous findings as to the existence of a deprivation, in this case, the record does not support a finding that those prior conditions continue to exist.[13]

---

[12] *In the Interest of R. C. M.*, 284 Ga. App. 791, 792 (645 SE2d 363) (2007).

[13] See id. at 798, n.6 (explaining that former "OCGA § 15-11-94 (b) (4) (A) requires the juvenile court to determine whether the child *is* a deprived child — that is, at the time of the hearing on the petition for termination of parental rights — not whether the child has ever been a deprived child") (punctuation omitted; emphasis in original) and compare with *In the Interest of I. S.*, 278 Ga. 859, 861, n. 6 (607 SE2d 546) (2005).

As an initial matter, the record does not support the juvenile court's finding that "[t]he evidence at the termination hearing was nearly identical to the evidence at the deprivation hearing. . . ." There was no evidence that the grandmother was still living in a tent in a state park. Additionally, to the extent that during the eight months she remained in Georgia the grandmother could not show evidence of stable income or housing, the record at the termination hearing undisputably established that after moving to Tennessee in late 2012, the grandmother has secured stable monthly income sufficient to support herself and D. J. T. Moreover, she secured stable, suitable housing and community support in Tennessee, and the home had been evaluated by Tennessee authorities. Thus, to the extent that the juvenile court based its finding of deprivation upon a finding that the grandmother continued to live in the same circumstances as those at the time of the deprivation order and that D. J. T. would experience the same circumstances if returned to her, the court's order is not supported by clear and convincing evidence.[14]

---

[14] Compare with *In the Interest of A. B.*, 251 Ga. App. 827, 830-831 (2) (555 SE2d 159) (2001).

(b) *Lack of proper parental care and control is the cause of the deprivation.* To the extent that D. J. T. was deprived at the time he was taken into custody in 2012, the grandmother does not dispute that she was the cause of that deprivation.

(c) *The cause of the deprivation is likely to continue.* The juvenile court found that she had not progressed in her case plan, however, the record actually established and the Department largely acknowledged that the grandmother had completed the majority of her case plan requirements. Further there is no evidence of a specific portion of the case plan that she has failed to fulfill, and the main concern on the part of the Department caseworker was the caseworker's lack of observation of the grandmother's in-person parenting. The caseworker, however, did not provide any evidence that the grandmother's parenting ability would cause serious harm to D. J. T.; rather, she simply had not had an opportunity to observe the grandmother to her satisfaction. Indeed, the caseworker testified that D. J. T. "visits with [the grandmother were] generally good."[15] The juvenile court's finding that the grandmother failed to maintain a bond with D. J. T. is contrary to all the evidence in

---

[15] We note that this is in stark comparison to the evidence provided as to the younger grandchildren, who, unlike D. J. T., suffered from severe emotional and developmental issues to the point that the Department had to separate them from D. J. T. by moving them to different foster homes.

17

the record, including the caseworker's testimony, and the fact that the grandmother maintained weekly phone visitation with D. J. T. after moving to Tennessee, although it is true that she did not visit in person with him frequently based on the extreme distance between the locations.

(d) *Continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child.* The grandmother contends, and we agree, that the record is devoid of evidence that serious harm would result if D. J. T. was returned to the grandmother or if the status quo was continued while the grandmother continued to work on her case plan.[16] The juvenile court's order cites to general propositions regarding stability through adoption, but there is no specific evidence that D. J. T. was suffering harm in the current arrangement or that he would suffer harm in the event he was returned to the grandmother's custody under the improved circumstances. Indeed, the record shows that while in the Department's custody, D. J. T. has experienced four different foster homes, and he was exhibiting emotional issues in his current foster home because of the addition of another non-sibling foster child.

---

[16] See *In the Interest of S. B.*, 335 Ga. App. at 8 (1); *In the Interest of R. C. M*, 284 Ga. App. 791, 799-800 (III) (3) (645 SE2d 363) (2007).

2. *Termination of the grandmother's parental rights was in D. J. T.'s best interest.* Again, the record is devoid of substantial testimony or evidence that it is in D. J. T.'s best interest that the grandmother's parental rights to him are terminated at this time. As stated previously, there is evidence that he is having issues with being one of two foster children in his current home, whereas he would be the only child under the care of the grandmother if he was returned to her. Despite the trial court's findings otherwise, the record shows that the grandmother has substantially completed her case plan. While her move back to Tennessee may have made more difficult the Department's job in reuniting D. J. T. and the grandmother, it is clear from the record that she has stabilized her income and housing, has community support, and has made positive improvements in her relationship with her daughter. The Department presented no evidence that the grandmother was a poor parent to D. J. T. outside of her issues with income and housing stability prior to returning to Tennessee. Thus, the juvenile court erred in its finding.[17]

3. *Failure to support under OCGA § 15-11-94 (B) (2).* Finally, we agree with the grandmother's contention that the juvenile court's finding that she failed to support D. J. T., thus supporting its order of termination, was without clear and

___

[17] See *In the Interest of S. B.*, 335 Ga. App. at 9-10 (1).

19

convincing evidence. First, there is no order of support. To the extent that there is any mention in any document of a need to pay an unknown amount of support, it is only a general statement in the initial case plan.[18] And finally, it is undisputed that the grandmother paid to have all five of the grandchildren including D. J. T. medically insured, which is evidence of support, in addition to gifts she would bring during visitation.

Because the juvenile court's findings were not supported by clear and convincing evidence, the court abused its discretion by terminating the grandmother's parental rights to D. J. T. Accordingly, we reverse the order in Case No. A15A2018.

*Case No. A15A2017*

On January 2, 2014, the juvenile court granted the Department's petition as to M. M. R. In its order, the court again found that "evidence at the termination hearing was nearly identical to the evidence at the deprivation hearing and at every review

---

[18] See *In the Interest of D. P.*, 326 Ga. App. 101, 110-111 (1) (c) (756 SE2d 207) (2014) (holding that "there was insufficient clear and convincing evidence in the record to support a finding that the mother's failure to pay child support was without justifiable cause" when no specific child support was ordered and only evidence of notice to mother was general order notice stating "[the Department] expects you to pay child support while your child is in state custody. Failure to pay child support is a ground for termination of your parental rights"). Compare with *In the Interest of R. W.*, 248 Ga. App. 522, 526 (2) (546 SE2d 882) (2001) (noting that "[a] parent, however, has a statutory duty to support her children, with or without a court order.").

hearing conducted by this [c]ourt." It also found that the mother had not parented M. M. R. in almost two years and had not exercised her in-person visitation. The court found that although the mother had provided gifts and other items when visiting M. M. R., this did not constitute supporting the child as contemplated by OCGA § 15-11-94 (b) (2).

4. (a) *Deprivation.* The mother did not appeal the juvenile court orders finding M. M. R. to be deprived. Normally, a parent is bound by the court's findings with regard to those previous orders of deprivation.[19] The most recent deprivation order found M. M. R. deprived as to the mother because of her incarceration, her unstable housing, and her failure to provide adequate support for the child due to unstable or irregular employment. The evidence at the termination hearing, however, showed that the mother had secured steady employment and housing after leaving prison, and she was advancing at her workplace. Moreover, she had plans to enter school and to train for a management position at her current employer. Thus, to the extent that the juvenile court based its finding of deprivation upon a finding that the mother was incarcerated and that the child would continue to live in the same circumstances as

---

[19] See *In the Interest of I. S.*, 278 Ga. at 861, n. 6.

those at the time of the deprivation order, the court's order is not supported by clear and convincing evidence.[20]

(b) *Lack of proper parental care and control is the cause of the deprivation.* It is undisputed that to the extent M. M. R. previously was deprived, it was at least in part due to the mother's lack of care because she was incarcerated.

(c) *The cause of the deprivation is likely to continue.* Again, the juvenile court's order was not supported by clear and convincing evidence. The testimony showed that the mother maintained contact with M. M. R. while she was incarcerated as well as after her release on a weekly basis. Since leaving prison, the mother had stable housing as well as a stable job in which she had received a higher position with opportunity to continue advancing. The mother took responsibility for her past prescription drug abuse, and she was attending Narcotics Anonymous meetings. All the evidence showed that the mother had taken all the steps necessary to complete her case plan with the exception that the Department's caseworker had not had an opportunity to observe her in person parenting skills to the caseworker's satisfaction. But this issue seems, at least in part, based upon the Department's failure or refusal to remediate the distance and monetary factors preventing the mother from visiting

---

[20] See *In the Interest of R. C. M.*, 284 Ga. App. at 798 n. 6 (III) (1).

in-person. Based on these facts, the juvenile court erred by finding that the deprivation was likely to continue.[21]

(d) *Continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child.* There was a great deal of testimony presented by M. M. R.'s foster mother about her issues with tantrums and with gastrointestinal issues that the foster mother speculated arose from M. M. R. living in the campground. The Department, however, presented no evidence from a medical or psychological professional showing whether these issues resulted from the mother's actions, the grandmother's actions, or from the upheaval of the past two years, including M. M. R.'s time in foster care. To the extent that any of these issues were based on past deprivation, there was no evidence showing that M. M. R. would be harmed further by continuing the status quo or by being returned to her mother's care. In fact, the CASA testified that she believed that the mother was working diligently on her plan and wanted to regain custody by taking suggestions on parenting from the CASA and that M. M. R. would "be okay" if returned. At most, there was testimony to support a finding that the mother and M. M. R. would need continued support for

---

[21] See id. at 799-800 (III) (3), citing *In the Interest of B. N. A.*, 248 Ga. App. 406, 410-411 (1) (546 SE2d 819) (2001); *In the Interest of K. J.*, 226 Ga. App. 303, 305-306 (1), 307-308 (2) (486 SE2d 899) (1997).

23

M. M. R.'s issues if custody was transferred. Accordingly, the juvenile court erred by finding that continued deprivation would cause serious harm to M. M. R.[22]

5. *Termination of the mother's parental rights was in M. M. R.'s best interests.* As above, the juvenile court's order is without clear and convincing evidence. While permanency is desirable, there was testimony that M. M. R.'s issues in her foster home were on-going, and no testimony or other evidence showed that the issues would be exacerbated or would be untreatable if her care were transferred back to her mother or if the status quo were maintained. The mother worked to maintain her bond with M. M. R. throughout her incarceration and afterward, and although her choice to move to Tennessee made it more difficult for the Department to observe her parenting skills, it does not mean that termination is supported as a result thereof.[23]

6. *Failure to pay child support pursuant to OCGA § 15-11-94 (b) (2).* As stated in Division 3, the Department never provided specific instructions or amounts for payment of support; instead, the Department apparently rebuffed the mother's attempts to obtain information regarding support payments. Accordingly, the trial

---

[22] See *In the Interest of K. J.*, 226 Ga. App. at 308 (2) (b).

[23] See *In the Interest of S. B.*, 335 Ga. App. at 9-10 (1).

24

court erred by finding that the mother had failed to provide support or that termination of her rights could be based on such a finding.[24]

"While we are reluctant to reverse the juvenile court's determination, no judicial determination is more drastic than the permanent severing of the parent-child relationship. Termination of parental rights is a remedy of last resort."[25] Because the juvenile court's findings were not supported by clear and convincing evidence, the court abused its discretion by terminating the mother's parental rights to M. M. R. Accordingly, we reverse the order in Case No. A15A2017.

*Judgments reversed. Phipps, P. J., concurs. Boggs, J., concurs in judgment only.*

---

[24] See *In the Interest of D. P.*, 326 Ga. App. at 110 (1) (c).

[25] (Punctuation omitted.) *In the Interest of S. B.*, 335 Ga. App. at 9-10 (1), quoting *In the Interest of C. S.*, 319 Ga. App. 138, 148 (1) (735 SE2d 140) (2012); *In the Interest of A. A.*, 252 Ga. App. 167, 173 (2) (c) (555 SE2d 827) (2001).