A07A2314. IN THE INTEREST OF M. D. N., a child.
(657 SE2d 594)
MIKELL, Judge.

M. N., the biological father of five-year-old M. D. N., appeals the Gwinnett County Juvenile Court's order terminating his parental rights to M. D. N.[1] For the reasons set forth below, we affirm the termination order.

> On appeal from a termination order, this Court views the evidence in the light most favorable to the appellee and determines whether any rational trier of fact could have found by clear and convincing evidence that the biological parent's rights to custody have been lost. We do not weigh the evidence or determine the credibility of witnesses, but defer to the trial court's factfinding and affirm unless the evidence fails to satisfy the appellate standard of review.[2]

So viewed, the record shows that the Gwinnett County Department of Family and Children Services (the "Department") gained tempo-rary protective custody of M. D. N. on May 11, 2005, after the police

---

[1] The court's order also terminates the rights of M. D. N.'s biological mother, R. D., but she is not a party to this appeal.
[2] (Footnotes omitted.) *In the Interest of F. C.*, 248 Ga. App. 675 (549 SE2d 125) (2001).

were called to the home of M. D. N.'s parents, R. D. and M. N., in March 2005, to investigate a domestic disturbance and arrested R. D. and M. N. on outstanding warrants.[3] M. D. N. was "safety resourced" to a maternal aunt, T. J., who later filed a complaint with the Department, alleging that R. D. and M. N. were threatening her and causing problems at her home. The Department filed a deprivation petition on June 3, 2005, which stated that R. D. had stipulated that she and appellant used drugs and had issues with domestic violence, and that appellant had stipulated that M. D. N. was deprived because he had failed to legitimate the child and had refused to consent to a drug screen. The petition also requested that legal custody of M. D. N. remain with the Department as T. J. no longer wished to keep the child because R. D. had harassed her.

Shortly thereafter on June 13, 2005, the Department filed its initial case plan, recommending nonreunification and setting forth secondary goals for appellant to: (1) legitimate M. D. N.; (2) pay child support; and (3) remain in contact with the Department. The court issued its 30-day review order on July 1, 2005, which incorporated the Department's case plan. However, contradicting the case plan, the court's order indicated that the goal was reunification. This order was not appealed. Nonetheless, recognizing the conflict created, the guardian ad litem requested a hearing to determine the status of the case on December 12, 2005.

The next hearing was held on or about March 8, 2006. Presumably as a result thereof, on March 15, 2006, the court issued three orders, an emergency hearing order, a final hearing order, and an order permitting M. D. N. an extended visit with relatives Ken and Renee Murphy, who were interested in adopting him. In both the emergency and final hearing orders, the court found that M. D. N. was deprived; that custody would remain with the Department; and that M. N. would have no rights until he legitimated M. D. N. The court also ordered appellant to follow the same case plan as the mother after he legitimated M. D. N., which according to the court's order, included submitting to a psychological evaluation and attending alcohol and drug and domestic violence counseling. In the final hearing order, the court permitted the Department discretion to allow M. D. N. to live with his mother's maternal cousin, Heather Sanders, and noted that nonreunification was the permanency plan for the family. None of these orders was appealed. Appellant legitimated M. D. N. on March 23, 2006.

On April 18, 2006, the Department filed another deprivation complaint alleging that the earlier conditions under which M. D. N.

---

[3] M. N. remained incarcerated through the termination hearing.

was found to be deprived still existed and seeking a finding of nonreunification as to both parents in order to pursue permanency for the child. The Department complained that appellant was incarcerated and had not developed and maintained a parental bond with the child or provided for his care and support. On June 6, 2006, the Department filed another case plan, recommending a permanency plan of adoption. The plan acknowledged that appellant had achieved the case plan goals of legitimation and of contacting the Department but noted that he had not paid child support. The plan also added additional goals of establishing a relationship with M. D. N., taking parenting classes, resolving legal issues, and obtaining stable employment and housing. On July 18, 2006, the court entered an order extending the Department's custody of M. D. N. and found that nonreunification with appellant was in the child's best interest, to which appellant stipulated because of his incarceration, and that the permanency plan for the child was custody to a relative. The order also indicated that appellant stated that he intended to pursue reunification upon his release. This order was unappealed as well.

Five weeks later on August 25, 2006, the guardian ad litem filed a motion for review of permanency plan, stating that appellant had not visited or provided support for M. D. N. during the last 15 months and requesting that the Department file a termination of parental rights petition and that permanent custody be placed with the Murphys to effectuate M. D. N.'s adoption. Two months later, the Department filed a petition to terminate parental rights.

A citizen review panel was held on February 14, 2007, and the panel recommended the termination of parental rights and a permanency plan of adoption. In support of its recommendations, the panel concluded that M. D. N. was deprived due to domestic violence in the home and because both of his parents were arrested on outstanding warrants; that the mother stated that she and appellant were substance abusers; that the father was incarcerated and the mother's whereabouts were unknown; that M. D. N. was residing with the Murphys and had been living with them for a year; that he had made a lot of progress with the Murphys, was very close to them, and thought of them as his parents; that the Murphys' niece had adopted one of M. D. N.'s eight siblings; and that M. D. N.'s therapist believed that therapy was no longer necessary because the child was doing well in the Murphys' care.

On February 22, 2007, the court held the termination hearing. The Department's social services case manager, Eboni Robinson, testified that the Department filed the petition for termination of parental rights because M. D. N. had been in its care for almost two years and that the Department was concerned about "foster care

drift." Robinson testified that foster care drift caused the development of detachment behaviors, attachment issues, and emotional and behavioral issues, all of which M. D. N. had exhibited. Robinson further testified that neither parent had provided care or financial or emotional support to M. D. N.; that they had not visited the child since she became involved in the case in July 2006; that appellant first contacted her in December 2006; that M. D. N. had some memory of his mother but had none of his father; and that the Murphys wanted to adopt the child.

Elton Young, M. D. N.'s counselor, testified that he worked with M. D. N. from September 2005 to December 2006 and that during treatment, M. D. N. experienced anxiety, causing bedwetting, because his mother abruptly stopped attending visits with him, and because he was very fearful that someone was going to take him away from the Murphys. Young testified that when he closed M. D. N.'s case, the child had adjusted well and was doing well in school and was very much a part of the Murphy family. Young opined that it would be in M. D. N.'s best interest to remain with the Murphys.

Appellant testified at the hearing that he was with M. D. N. every day until he was arrested in May 2005. Appellant remained incarcerated after the arrest and entered a nonnegotiated plea to one count of burglary in October 2006, for which he was sentenced to fifteen years to serve eighteen months in prison work camp followed by six months in the Gwinnett County work release program and the payment of an $8,000 fine. Appellant explained that he had not seen M. D. N. because he was incarcerated; that he would be getting out of jail on June 8, 2007; that while incarcerated, he had obtained his GED and planned to attend college to get a heating, ventilation, and air conditioning ("HVAC") license to open his own business; and that he loved his son and wanted him back. On cross-examination, appellant testified that he sent M. D. N. birthday cards, but they were returned to him; that he had a job as an HVAC mechanic upon his release from jail; and that he had money for a home and could pay for counseling if M. D. N. needed it. Appellant admitted that he had been in a work release program for a month and had saved $1,000 to rent a home but had not provided any financial support for M. D. N. He also admitted that he was sent back to prison work camp from the work release program on two occasions because he tested positive for alcohol, which was a violation of the terms of the program. Appellant explained that each time, the source of the alcohol in his system was over-the-counter cold medicine. The juvenile court entered an order terminating both appellant's and R. D.'s parental rights. Appellant appeals from that order.

Before terminating parental rights, a juvenile court must employ a two-prong test.[4] First, the juvenile court must make a finding of parental misconduct or inability, which is proved by clear and convincing evidence that: (1) the child is deprived; (2) lack of proper parental care or control is causing the deprivation; (3) the cause of the deprivation is likely to continue or will not likely be remedied; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child.[5] "In the second prong of the termination test, the juvenile court must consider whether termination of parental rights would be in the best interest of the child."[6] M. N. enumerates as error only the trial court's finding that the deprivation is likely to continue or will not be remedied. He does not challenge the other three factors required to show parental misconduct or inability. M. N. also argues that the trial court erroneously found that he had been arrested for domestic violence and failed to consider whether his failure to maintain contact with his child was wilful or wanton.

1. M. N. argues that there was no evidence to support the juvenile court's finding that the cause of M. D. N.'s deprivation is likely to continue or will not likely be remedied. In reaching its conclusion, the court relied in part on the fact that M. N. has not been in a position to parent M. D. N. due to his incarceration. Though "[a] parent's incarceration does not always compel the termination of parental rights, . . . it can support a termination when there are sufficient aggravating circumstances present."[7] One of the aggravating circumstances that may be considered is "whether the incarcerated parent has made an effort to communicate with the child and, despite imprisonment, maintain a parental bond in a meaningful, support-ive[,] and parental manner."[8] Here, M. N. testified that he tried to contact his son by sending letters to M. D. N.'s sister's father and to the aunt who first had physical custody of the child but offered no evidence in the form of returned letters or cards.[9] He admitted that he knew that the Department had custody of M. D. N. from May 9, 2005, but offered no evidence that he attempted to send anything to M. D. N.

---

[4] OCGA § 15-11-94 (a); *In the Interest of C. F.*, 251 Ga. App. 708, 711 (555 SE2d 81) (2001).

[5] OCGA § 15-11-94 (b) (4) (A) (i)-(iv); *In the Interest of R. N.*, 224 Ga. App. 202 (480 SE2d 243) (1997).

[6] (Citation omitted.) *In the Interest of S. B.*, 237 Ga. App. 692, 693 (515 SE2d 209) (1999). Accord *In the Interest of R. N.*, supra.

[7] (Footnote omitted.) *In the Interest of M. C. L.*, 251 Ga. App. 132, 134 (1) (a) (553 SE2d 647) (2001); *In the Interest of A. T. H.*, 248 Ga. App. 570, 572 (1) (547 SE2d 299) (2001).

[8] (Punctuation and footnote omitted.) *Stills v. Johnson*, 272 Ga. 645, 651 (3) (533 SE2d 695) (2000). Accord *In the Interest of T. A. M.*, 280 Ga. App. 494, 497 (2) (634 SE2d 456) (2006).

[9] See *In the Interest of S. B.*, 287 Ga. App. 203, 213 (2) (651 SE2d 140) (2007) (mother unable to substantiate claims that she called and wrote her children numerous times).

through the Department. In fact, caseworker Robinson testified that M. N. first contacted her to inquire about M. D. N. in December 2006, 19 months after M. D. N. was first placed in the Department's custody.

The failure to comply with case plan goals is also considered an aggravating factor.[10] One of M. N.'s case plan goals was to establish a relationship with the child, which as stated earlier, he did not do. Another of appellant's case plan goals was to pay child support, which he also failed to do. M. N. testified that he had saved $1,000 but offered no explanation as to why he had not contributed any of that money toward child support. M. N. also showed a disregard for this case plan goal when he violated the terms of the work release program twice by consuming alcohol, another factor relied upon by the juvenile court. Even accepting as true M. N.'s claim that he tested positive because of his use of over-the-counter cold medicine, we are disturbed that he would use the same medicine again, knowing that it would result in his revocation from the work release program, which at that time, was the last obstacle to M. N. having the opportunity to reunite with his son and the only means through which he could have provided child support had he wished to do so. There was no evidence offered as to whether M. N. had taken parenting courses while incarcerated, which was also a case plan goal. However, he did testify that he obtained a GED and was planning to go to college and that he would have stable employment and means to obtain housing upon his release from prison.

Appellant's decision to obtain a GED and his future intentions are commendable. However, courts are authorized to consider the past conduct of a parent in determining whether the deprivation is likely to continue[11] and "may place more weight on negative past facts than promises of future conduct."[12] Although the juvenile court should take recent improvements into account, it, not the appellate court, ultimately must determine whether those improvements warrant hope of rehabilitation.[13] And it may "assign much less weight to such assertions of sudden parental fitness when compared to the other evidence[,]"[14] as it did in this case.

---

[10] *In the Interest of M. C. L.*, supra at 135 (1) (a). See *In the Interest of K. B.*, 252 Ga. App. 808, 810 (556 SE2d 922) (2001) (failure to provide parental care and support considered an aggravating circumstance).

[11] *In the Interest of R. D. B.*, 282 Ga. App. 628, 631 (1) (b) (639 SE2d 565) (2006).

[12] (Punctuation and footnote omitted.) *In the Interest of A. C.*, 280 Ga. App. 212, 217 (1) (c) (633 SE2d 609) (2006).

[13] See *In the Interest of D. D. B.*, 282 Ga. App. 416, 419 (1) (638 SE2d 843) (2006).

[14] (Citation and punctuation omitted.) Id. at 418 (1).

In *In the Interest of J. D. F.*,[15] we reversed the juvenile court's finding that the evidence was sufficient to establish that the past deprivation was likely to continue. In that case, the father was incarcerated and would not be released for several months. However, there was evidence that the father wrote the court to determine how he could maintain contact with his children and asked that his children be allowed to visit him in prison. When his request was denied, he sent the children over 40 letters to which they replied and he sent them books and other small gifts.[16] The caseworker testified that the father's ability to communicate with his children was "beyond above average."[17] The father also submitted documentation from prison establishing that he completed substance abuse and anger management classes and was enrolled in parenting and GED classes.[18] We noted in that case that although there was evidence that the children were doing well in foster care, there was no evidence that the foster parents were ready or willing to adopt the children.[19] We do not have the same compelling facts here. M. N. had no bond with M. D. N. as the child had no memory of him. Although appellant testified that he tried to contact the child, he presented no documentary evidence in support of his claim and waited 19 months before he contacted M. D. N.'s caseworker. Unlike the father in *In the Interest of J. D. F.*,[20] appellant did not take the initiative to determine whether there were classes available to him in jail that would have helped him satisfy his case plan goals. Appellant tested positive for alcohol twice, compromising his ability to earn income, which he could have used to pay child support had he wished to do so. Finally, M. D. N. has been in the custody of foster parents who are relatives and are ready and willing to adopt him.

"The decision as to a child's future must rest on more than positive promises which are contrary to negative past fact."[21] Although appellant was going to be released from jail three months after his parental rights were terminated, this court is not required to gamble M. D. N.'s future on the promise that appellant will emerge from prison rehabilitated and drug free and take the steps necessary to provide for his son when he has done nothing other than taken the steps to legitimate the child to evidence his future intent. "Hence, the

---

[15] 277 Ga. App. 424 (626 SE2d 616) (2006).

[16] Id. at 426.

[17] Id. at 428 (1).

[18] Id. at 426.

[19] Id. at 428 (1).

[20] Id.

[21] (Punctuation and footnote omitted.) *In the Interest of S. B.*, supra, 287 Ga. App. at 213 (2).

trial court committed no error in assigning little weight to the appellant['s] 'assertion[ ] of sudden parental fitness' and determining that the deprivation was likely to continue."[22]

2. In his second enumerated error, M. N. argues that the trial court erred in finding that he had been arrested for domestic violence. M. N. is correct because the evidence shows that the police were called to M. N.'s home to investigate domestic violence, but M. N. was actually arrested because of outstanding warrants. The court's error, however, did not affect its decision to terminate M. N.'s parental rights. Accordingly, we find no merit to this enumerated error.[23]

3. Finally, M. N. maintains that the trial court erred in failing to consider whether his failure to maintain meaningful contact with M. D. N. was wilful or wanton. In support of his argument, M. N. relies on cases discussing the consequences suffered by parents who wantonly and wilfully fail to comply with a child support order for twelve months or more.[24] "[N]othing in the statutory framework for terminating parental rights set forth at OCGA § 15-11-94 (a)-(b) requires that the parental misconduct or inability be wilful in nature."[25] Accordingly, this error fails as well.

*Judgment affirmed. Johnson, P. J., and Phipps, J., concur.*

DECIDED FEBRUARY 5, 2008.

*David L. Whitman*, for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Kathryn A. Fox, Assistant Attorney General, Victoria W. Wuesthoff*, for appellee.

---

[22] (Citation omitted.) *In the Interest of R. N. H.*, 286 Ga. App. 737, 742 (1) (c) (650 SE2d 397) (2007). Compare *In the Interest of R. C. M.*, 284 Ga. App. 791, 794-795, 799-800 (III) (3) (645 SE2d 363) (2007) (termination of father's parental rights reversed where father could not complete case plan goals because of incarceration but wrote to his children every week, had one visit with his children post-incarceration that a counselor described as "quite a positive visit," and the children were closely bonded with their father despite his two-year incarceration and expressed a desire to continue their relationship with him).

[23] See generally *In the Interest of K. D.*, 285 Ga. App. 673, 680 (1) (d) (647 SE2d 360) (2007) (trial court's finding that domestic violence caused premature labor, if error, was harmless as it would not have changed the ruling on the termination petition).

[24] See *In the Interest of M. H. F.*, 201 Ga. App. 56 (410 SE2d 167) (1991); *Kriseman v. Kenmore*, 143 Ga. App. 490, 491 (1) (238 SE2d 585) (1977). See also OCGA § 15-11-94 (b) (2) (formerly OCGA § 15-11-81 (b) (2)).

[25] *In the Interest of D. N. B.*, 258 Ga. App. 481, 484 (1) (574 SE2d 574) (2002).