**THIRD DIVISION**
**DILLARD, P. J.,**
**GOBEIL and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 6, 2020**

# In the Court of Appeals of Georgia

A19A2237. IN THE INTEREST OF C. S., a child (father).

DILLARD, Presiding Judge.

Chauncy Smith,[1] five-year-old C. S.'s putative father, appeals the juvenile court's termination of his parental rights, arguing the court erred in finding that clear and convincing evidence established that he legally abandoned C. S. and the child is dependent. Chauncy also contends that his trial counsel rendered ineffective assistance by failing to file a legitimation petition on his behalf and object to inadmissible evidence. For the reasons set forth *infra*, we affirm.

---

[1] Because C. S.'s mother, putative father, and step-father all share a last name, we refer to them throughout this opinion by their first names.

Viewing the evidence in the light most favorable to the juvenile court's ruling,[2] the record shows that Mary Smith and Chauncy, C. S.'s parents, began dating in high school. And while the couple dated "on and off" throughout their relationship, they never married or lived together. On April 17, 2013, the year after they graduated, C. S. was born,[3] and between 2013 and 2015, Mary took C. S. to see Chauncy "pretty often." During that time, Chauncy began physically abusing Mary. As one example, on C. S.'s first Thanksgiving, Chauncy, in C. S.'s presence, "jumped on [Mary] and shoved [her] on the bed and started hitting [her]." Mary began screaming, and eventually, Chauncy's mother came into the room and pulled him off of her. On another occasion, when Mary was driving, Chauncy accused her of talking to one of his friends and punched her in the eye. Mary's injuries were so significant that she had to go to the hospital for treatment.[4] C. S. was not with his parents during this altercation, but he witnessed Chauncy's acts of violence at other times. On one

---

[2] *See In the Interest of D. M.*, 339 Ga. App. 46, 46 (793 SE2d 422) (2016) (noting that on appeal from the termination of parental rights, this Court views the evidence in the light most favorable to the trial court's disposition of the case).

[3] C. S. was five years old at the time of the 2018 termination hearing.

[4] At the termination hearing, Mary submitted into evidence pictures of the injuries she sustained when Chauncy punched her and the related medical records.

2

occasion, when Mary and C. S. were at Chauncy's house, he tried to kick her down the stairs, and to escape the violence, Mary and C. S. hid in a bathroom until Chauncy left. Chauncy also admitted to breaking Mary's cell phone and damaging the cars of other girlfriends, and he conceded that such property destruction was "kind of a pattern" with the women he dated. Ultimately, when C. S. was two years old, Mary and Chauncy ended their dating relationship.

Initially, following the break up, Mary continued taking C. S. to visit Chauncy, but the last time Chauncy and C. S. saw each other was on Christmas in 2015, when, upon Chauncy's request, Mary took C. S. to visit his paternal grandmother's house. But during that visit, C. S. only interacted with Chauncy for about five to ten minutes because Chauncy "was upstairs throwing up the whole time." Chauncy had a history of drug abuse, and Mary suspected that he was "under the influence of something" because his eyes were red and he was slurring his words. Before Mary and C. S. left, she told Chauncy and his mother that she and C. S. "weren't going to come around anymore until [Chauncy] got clean."

Sometime later, Mary heard that Chauncy had been "getting arrested for drugs[,]" and she offered several times to pay for a drug test if Chauncy would get clean because she did not feel comfortable around him while he was taking drugs.

3

Chauncy declined those offers. And over the years that followed, Chauncy only reached out to Mary "a handful of times . . . just at holidays." Indeed, Chauncy's attempts to contact Mary were "very sporadic[,]" and other than paying a single daycare bill when C. S. was two years old, Chauncy provided no financial support for C. S., either during Mary's pregnancy or after C. S. was born. Since 2015, Mary answered one or two calls from Chauncy, but she did not answer other calls because she did not realize that the numbers listed were Chauncy calling her from jail. Mary knew that Chauncy had been arrested six times for drug offenses and driving under the influence,[5] and eventually, she "cut [off] communication" with him entirely. In addition to her belief that Chauncy's constant drug use posed a danger to C. S., Mary was also concerned about his temper and history of physical violence. Nevertheless, Mary told Chauncy's mother that his family could be involved in C. S.'s life, but no one ever contacted Mary to accept this offer. Thereafter, Chauncy never initiated any legal proceedings to seek visitation with C. S., nor did he file a legitimation petition.

---

[5] During the termination hearing, Mary submitted into evidence certified copies of Chauncy's criminal convictions. Chauncy admitted that he had, among others, two felony convictions for battery and false imprisonment of the mother of another one of his children. At the time of the termination hearing, Chauncy was incarcerated for violating his probation by continuing to use illegal drugs.

On September 30, 2017, Mary married Tyson Smith, and they had a child together. Tyson has been involved in C. S.'s life since he was two years old, and in the three years that elapsed since then, C. S. began to view Tyson as his father. According to Mary, Tyson participates in C. S.'s sporting events and helps with discipline and the day-to-day care of C. S., such as feeding him and bedtime routines. Tyson also provides financially for Mary and C. S. by paying for, *inter alia*, their house, insurance, and groceries. While C. S. "doesn't know [Chauncy]," he has, in contrast, developed a close relationship with his stepfather. In fact, Tyson is the only father figure C. S. has ever known, and eventually, Tyson would like to adopt him.

According to Courtney Moss, the guardian ad litem, C. S. appears to be a happy, healthy, well-adjusted child, who is full of energy. Moss believes C. S. is thriving in his current environment, and he identifies Tyson as his dad. But when Moss asks C. S. about Chauncy, C. S. does not recognize his name. At the termination hearing, Moss noted that although Chauncy received notice of the instant action in April 2018, he still had not filed a petition to legitimate C. S. at the time of the termination hearing on November 16, 2018. In Moss's opinion, Chauncy also has unresolved mental health and substance abuse issues. Moss also believes C. S. needs permanency, and she has no doubt that Mary and Tyson would be able to take care

of and provide for him. Ultimately, Moss contended that "there is abandonment in this case[,]" and thus, she recommended that the court terminate Chauncy's parental rights.

On March 16, 2018, Mary filed a "petition to terminate biological father's parental rights," asserting that (1) Chauncy has never supported C. S. financially with the exception of a one-time payment of $70.00 for daycare costs; (2) Chauncy has not seen C. S. since Christmas 2015; (3) C. S. does not know Chauncy and considers his stepfather to be his father; (4) it would be in C. S.'s best interest to have no further contact with Chauncy; and (5) Tyson is ready and willing to adopt C. S. and formalize the parental bond and relationship he has with the child.[6] On the same day, Mary's attorney sent a letter to Chauncy, notifying him that the petition had been filed and enclosing a copy of same. On December 7, 2018, following a hearing on the matter, the juvenile court granted the petition and issued an order terminating Chauncy's parental rights.

Thereafter, Chauncy filed a motion for a new trial, which, after a hearing, the juvenile court denied. Chauncy then obtained new counsel and filed a motion to

---

[6] The petition was not officially docketed in the juvenile court clerk's office until April 3, 2018.

vacate the court's order denying his motion for a new trial, arguing, *inter alia*, that the court must address his claims that he received ineffective assistance of counsel in the termination proceedings. The juvenile court agreed, vacated its prior order, and informed Chauncy that he could file an amended motion for a new trial. Chauncy filed such a motion, arguing, *inter alia*, that the juvenile court's findings were not supported by clear and convincing evidence and that he received ineffective assistance of counsel in several respects. On March 28, 2019, the juvenile court held a hearing on Chauncy's amended new-trial motion, and ultimately, denied it. This appeal follows.

On appeal from a juvenile court's decision to terminate parental rights, we review the evidence "in the light most favorable to the court's decision and determine whether any rational trier of fact could have found by clear and convincing evidence that the parental rights should be terminated."[7] In doing so, we do not weigh the evidence or resolve credibility issues, but "merely determine whether a rational trier

---

[7] *In the Interest of S. B.*, 335 Ga. App. 1, 6 (1) (780 SE2d 520) (2015) (punctuation omitted).

7

of fact could have found by clear and convincing evidence that the natural parent's right to custody should be terminated."[8] Nevertheless,

> this deferential standard of review is tempered by the fact that there is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship. It must be scrutinized deliberately and exercised most cautiously. The right to raise one's children is a fiercely guarded right in our society and law, and a right that should be infringed upon only under the most compelling circumstances.[9]

Bearing this analytical framework in mind, we turn to Chauncy's specific claims of error.

1. Chauncy argues the juvenile court erred in finding that he legally abandoned C. S. and in doing so, established that one parent can "decidedly prevent" the second parent from having a relationship with their child. We disagree.

OCGA § 15-11-310 (a) provides that "[i]n considering the termination of parental rights, the court shall first determine whether one of the . . . statutory grounds

---

[8] *Id.* (punctuation omitted).

[9] *In the Interest of E. G. L. B.*, 342 Ga. App. 839, 840 (805 SE2d 285) (2017) (punctuation omitted).

8

for termination of parental rights has been met . . .[,]" and one of those grounds is when "[a] child is abandoned by his or her parent."[10] Abandonment is defined as

> any conduct on the part of a parent, guardian, or legal custodian showing an intent to forgo parental duties or relinquish parental claims. Intent to forgo parental duties or relinquish parental claims may be evidenced by[,] [*inter alia,*]

> (A) [f]ailure, for a period of at least six months, to communicate meaningfully with a child;

> (B) [f]ailure, for a period of at least six months, to maintain regular visitation with a child;

> (C) [l]eaving a child with another person without provision for his or her support for a period of at least six months;

> (D) [f]ailure, for a period of at least six months, to participate in any court ordered plan or program designed to reunite a child's parent, guardian, or legal custodian with his or her child; [and]
> . . .

> (H) [a]ny other conduct indicating an intent to forgo parental duties or relinquish parental claims.[11]

---

[10] OCGA § 15-11-310 (a) (4).

[11] OCGA § 15-11-2 (1) (A)-(D) & (H). We refer to the statute in effect in 2018, as that is the year applicable to the termination order in this case. And while the statute was amended effective on May 7, 2019, the language in the sections of the statute at issue has not changed. *Compare* OCGA § 15-11-2 (1) (a) (2018), *with* OCGA § 15-11-2 (1). Additionally, in addressing the issue of abandonment, the

Significantly, to constitute abandonment, the conduct must "actually show an intent to abandon in light of the rest of the record."[12] And under OCGA § 15-11-310 (b), "[i]f any of the statutory grounds for termination has been met, the court shall then consider whether termination is in a child's best interests . . . ."

In the termination order, the juvenile court found that clear and convincing evidence established that Chauncy abandoned C. S. within the meaning of the foregoing statutes, and the evidence supports its decision in this respect. Indeed, the undisputed evidence shows that at the time of the November 2018 termination

---

juvenile court only cited OCGA § 15-11-2 (1) (A)-(B) & (H), but in substance, it also found that the evidence satisfied subsections (1) (C) and (1) (D). Specifically, as to subsection (1) (C), the court found that Chauncy has never "paid consistent child support or provided consistent in kind support for at least the last three years." And while Chauncy contends on appeal that he went to "child support enforcement attempting to pay support . . . [,]" the undisputed evidence shows that—other than making a single daycare payment when C. S. was two years old—he never actually paid child support or provided any other assistance to Mary for C. S.'s care since that time. Regarding subsection (1) (D), the court found that there was clear and convincing evidence that Chauncy, without justifiable cause, "failed significantly for a period of six months prior to the termination hearing . . . .to comply with a court ordered plan designed to reunite such parent with his . . . child." It is worth noting, however, that there is no evidence that such a plan ever existed. Presumably, this is because, until now, Chauncy has never been party to a legal proceeding during which a parenting plan could be issued by a court. Thus, the responsibility for the lack of a any parenting plan with which to comply lies solely with Chauncy.

[12] *In the Interest of J. A. B.*, 336 Ga. App. 367, 370 (785 SE2d 43) (2016).

hearing, Chauncy had no contact with C. S. for nearly *three years*. And while Mary admittedly quit allowing Chauncy to see C. S. at some point after Christmas 2015, she did so only because he refused to quit using illegal drugs, which she felt posed a danger to C. S. In fact, Chauncy was so inebriated during his last encounter with C. S. that, even though it was Christmas, the visit lasted only a few minutes. At the termination hearing, Chauncy admitted to having a "drug problem," and, even though he knew getting clean was a condition for seeing his son, he made no effort to do so. According to Chauncy, a court ordered him to complete a 12-month impatient rehabilitation program for drug abuse, but he had not yet enrolled in one. In addition to his drug use, there was also evidence that Chauncy has a violent temper, destroyed property of his girlfriends, and perpetrated acts of physical abuse against Mary both in and out of C. S.'s presence. Chauncy even admitted that he had a pattern of being violent with his girlfriends, and there was no evidence that he planned to seek any help for his anger issues.[13]

---

[13] *See In the Interest of L. P.*, 339 Ga. App. 651, 655 (1) (794 SE2d 252) (2016) ("[D]espite the [parent's] claim of newfound personal reform, which is for the juvenile court to weigh, the evidence in the record was clear and convincing to support the juvenile court's finding that the mother had continued her pattern of drug use . . . and had not been successful in completing a drug treatment program."); *In the Interest of M. D. N.*, 289 Ga. App. 499, 505 (1) (657 SE2d 594) (2008) ("The decision as to a child's future must rest on more than positive promises which are contrary to

Furthermore, Chauncy has been unable to form a parent-child relationship with C. S., at least in part, because he was *repeatedly* incarcerated over the previous three years for various criminal offenses and was still incarcerated at the time of the termination proceedings. To be sure, a parent's incarceration does not always compel the termination of parental rights, but it can "support a termination [when] sufficient aggravating circumstances are present."[14] Those circumstances are present in this case. Indeed, one of the factors that may be considered is whether the incarcerated parent has "made an effort to communicate with the child and, despite imprisonment, maintain a parental bond in a meaningful, supportive and parental manner."[15] Here, Mary testified that Chauncy only contacted her about seeing C. S. "a handful of times . . . just at holidays[,]" and his attempts to communicate with her were "very sporadic[.]" And while Chauncy testified that he made many attempts to contact Mary, the juvenile court evidently did not find his testimony credible, and we will not

negative past fact." (punctuation omitted)).

[14] *In the Interest of T. Z. L.*, 325 Ga. App. 84, 94 (1) (a) (751 SE2d 854) (2013); *accord In the Interest of D. T. A.*, 312 Ga. App. 26, 32 (1) (c) (717 SE2d 536) (2011).

[15] *In the Interest of T. Z. L.*, 325 Ga. App. at 94 (1) (a); *accord In the Interest of T. L. H.*, 301 Ga. App. 10, 15 (686 SE2d 478) (2009).

second guess the court's credibility determinations.[16] There is also no evidence that Chauncy made attempts to send any letters or cards to C. S. in an effort to develop a relationship with him. Moreover, even if Chauncy did not have C. S.'s address, Mary told Chauncy's mother that his family members could have a relationship with C. S., and there is no evidence that Chauncy ever attempted to send mail to C. S. through his mother or any other family member.[17]

Other aggravating factors a court may consider in determining whether a parent's incarceration supports termination of his or her parental rights include "a history of incarcerations for repeated criminal offenses, [and] a determination that it is likely such criminal history will continue upon release . . . ."[18] Here, in the three

---

[16] *See In the Interest of E. M.*, 347 Ga. App. 351, 354 (2) (819 SE2d 505) (2018) ("On appeal from an order terminating parental rights, . . . [w]e neither weigh evidence nor determine witness credibility, but defer to the juvenile court's findings of fact and affirm unless the appellate standard is not met." (punctuation omitted)); *In the Interest of A. R.*, 302 Ga. App. 702, 702 (691 SE2d 402) (2010) (same).

[17] *In the Interest of M. D. N.*, 289 Ga. App. 499, 503 (657 SE2d 594) (2008) (holding that aggravating circumstances as to a parent's incarceration existed when, *inter alia*, there was no evidence that the incarcerated parent tried to send anything to family members of the child or to the child after the parent knew he had been placed in the Department's custody).

[18] *In the Interest of T. Z. L.*, 325 Ga. App. at 94 (1) (a); *accord In the Interest of M. R. B.*, 350 Ga. App. 595, 604-05 (1) (829 SE2d 848) (2019).

years between Chauncy's last contact with C. S. and the termination hearing, Chauncy had been convicted of at least *six* criminal offenses, several of which were drug-related. At the hearing, Chauncy admitted that he still has a problem with illegal drugs, and while he testified that he intended to participate in a rehabilitation program in the future, he made no effort to address the issue in the previous three years until he was required to do so by a court order.[19]

Given the foregoing, the juvenile court's determination that Chauncy abandoned C. S. within the meaning of OCGA § 15-11-310 (a) (4) and OCGA § 15-11-2 (1) was supported by clear and convincing evidence.[20] But this does not end our

[19] *See supra* note 13.

[20] *See* OCGA § 15-11-310 (a); OCGA § 15-11-2 (1) (A)-(D) & (H); *In the Interest of R. S. T.*, 345 Ga. App. 300, 318 (812 SE2d 614) (2018) (Dillard, C.J., concurring) (concluding that a case in which a parent-child relationship was "virtually nonexistent[,]" as here, is a "classic abandonment case"); *In the Interest of B. D. O.*, 343 Ga. App. 587, 591 (1) (807 SE2d 507) (2017) (holding that the record supported a finding of abandonment when the evidence showed that, *inter alia*, the father paid no child support, had not seen the child for over one year leading up to the termination proceedings, and failed to legitimate the child); *In the Interest of L. S.*, 244 Ga. App. 626, 627 (1) (536 SE2d 533) (2000) (holding that evidence was sufficient to support finding of abandonment [when] father only participated in two scheduled visits with child, maintained no contact with child for over two years, and provided no monetary support to child while the child was in foster care). *Cf. In the Interest of T. C.*, 281 Ga. App. 137, 139-40 (1) (b) (635 SE2d 395) (2006) (holding that evidence was sufficient to show that a parent failed to develop and maintain a meaningful bond with his children when he had seen them only once in the previous

inquiry. Indeed, OCGA § 15-11-310 (b) provides that, "[i]f any of the statutory grounds for termination has been met, the court shall then consider whether termination is in a child's best interests after considering [certain delineated] factors . . . ." On appeal, Chauncy does not challenge the *substance* of the court's finding that termination of his parental rights was in C. S.'s best interests, and thus, he has abandoned any such argument on appeal.[21] Nevertheless, in addressing a different claim of error, Chauncy summarily contends that the juvenile court erred in failing to make the statutorily required written findings of fact to support its conclusion that termination of his parental rights was in C. S.'s best interests and that the written order was deficient because it included only "a dry recitation . . . that certain legal requirements have been met . . . ."

---

year, had not sent a card, letter, or present to the children (except for during the one visit at Christmas) in the preceding two years, had not contacted DFCS since the children were removed from their home, and never paid child support).

[21] *See Hewitt v. Community & S. Bank*, 324 Ga. App. 713, 716 (2) (751 SE2d 513) (2013) ("Grounds that are not attacked as erroneous will not be considered on appeal and are presumed to be binding and correct. An appellant's failure to attack alternative bases for a judgment results in the affirmance of that judgment.") (punctuation omitted)); *Reed v. City of Atlanta*, 136 Ga. App. 193, 194 (4) (220 SE2d 492) (1975) (holding that an enumeration of error neither argued nor briefed on appeal is considered abandoned).

To the extent this cursory argument is not also abandoned, it is belied by the record. Indeed, the juvenile court's written order provides detailed findings of fact to support its conclusion that termination of Chauncy's parental rights is in C. S.'s best interests. These findings included, *inter alia*, (1) the lack of any meaningful relationship or bond between Chauncy and C. S., (2) C. S.'s need—rather than some generalized need—for permanence in his current environment with his mother and stepfather where he feels secure and his needs are met; (3) extended periods of Chauncy having no meaningful contact with C. S., which resulted in a lack of stability and continuity between Chauncy and C. S.; and (4) that Chauncy's illegal drug use and acts of violence would be detrimental to C. S. The evidence detailed *supra*—especially the testimony of C. S.'s guardian ad litem—clearly and convincingly supported the court's written findings in this respect.

2. Chauncy next argues that the trial court erred in finding that C. S. was dependent as to him, the dependency was likely to continue, and the dependency caused harm to C. S. In doing so, Chauncy references the requirements of OCGA § 15-11-310 (a) (5), which, unlike subsection (a) (4), requires a dependency

determination.[22] Chauncy also contends that the juvenile court's factual findings were deficient as to the issue of dependency. But the different grounds for terminating parental rights under OCGA § 15-11-310 (a) "are independent, and thus, on appeal, if there is sufficient evidence supporting any one of these grounds, we need not consider the other grounds in order to affirm."[23] If one of the above grounds has been established, the juvenile court shall then consider whether termination of parental rights is in the child's best interests. Because we held in Division (1), *supra*, that the juvenile court did not err in finding that Chauncy abandoned C. S. within the meaning of OCGA § 15-11-310 (a) (4), we need not also address whether the termination of

---

[22] *See* OCGA § 15-11-310 (a) (5) (providing that one ground for termination is when "[a] child is a dependent child due to lack of proper parental care or control by his or her parent, reasonable efforts to remedy the circumstances have been unsuccessful or were not required, such cause of dependency is likely to continue or will not likely be remedied in the reasonably foreseeable future, and: (A) [r]eturning such child to his or her parent is likely to cause serious physical, mental, moral, or emotional harm to such child or threaten the physical safety or well-being of such child; or (B) [c]ontinuation of the parent and child relationship will cause or is likely to cause serious physical, mental, moral, or emotional harm to such child").

[23] *In the Interest of E. M.*, 347 Ga. App. at 356 (2) (a); *see In the Interest of B. D. O.*, 343 Ga. App. at 591 (1) (pretermitting whether evidence established grounds for termination under OCGA § 15-11-310 (a) (5) when clear and convincing evidence supported termination as to other grounds).

Chauncy's parental rights also satisfied the requirements of OCGA § 15-11-310 (a) (5).

3. Lastly, Chauncy argues that his counsel rendered ineffective assistance by failing to file a legitimation petition on his behalf and failing to object to inadmissible evidence. Again, we disagree.

It is well-settled in Georgia that the right to the custody and control of one's child is a "fiercely guarded right in our society and in our law[,] [and] [i]t is a right that should be infringed upon only under the most compelling circumstance."[24] Thus, we have recognized that a parent has "a right to effective assistance of counsel in defending against a termination petition."[25] And to prevail on a claim of ineffective assistance of counsel, Chauncy must show that "his counsel's performance was

---

[24] *In the Interest of S. B.*, 335 Ga. App. 1, 10 (2) (780 SE2d 520) (2015) (punctuation omitted); *accord In the Interest of D. P.*, 326 Ga. App. 101, 103 (756 SE2d 207) (2014).

[25] *In the Interest of S. B.*, 335 Ga. App. at 10 (2); *see In the Interest of M. G. W.*, 341 Ga. App. 475, 479 (801 SE2d 102) (2017) ("With the passage of the new Juvenile Code, "the Georgia legislature again has made clear as a matter of statutory law that an indigent parent in a termination proceeding has a right to counsel at all stages of the proceeding." (footnote omitted)); OCGA § 15-11-262 (a) (providing that "[a] child and any other party to a [termination] proceeding . . . shall have the right to an attorney at all stages of the proceedings").

18

deficient and that the deficient performance was prejudicial to his defense."[26] To show that counsel was deficient, "the father must overcome the strong presumption that counsel's performance fell within a wide range of professional conduct and that counsel's decisions were made in the exercise of reasonable professional judgment."[27] And to show prejudice, the father must demonstrate that "there is a reasonable probability that, absent counsel's unprofessional errors, the result of the trial would have been different."[28] Lastly, a juvenile court's finding that a parent has been afforded effective assistance of counsel will be affirmed on appeal "unless that finding is clearly erroneous."[29]

---

[26] *In the Interest of S. B.*, 335 Ga. App. at 10 (2) (punctuation omitted); *see In the Interest of M. S. S.*, 308 Ga. App. 614, 625 (3) (708 SE2d 570) (2011) ("To prevail on her claim of ineffective assistance of counsel, the [father] must prove both that the performance of [his] lawyer was deficient and that [he] was prejudiced by this deficient performance.").

[27] *In the Interest of S. B.*, 335 Ga. App. at 10 (2) (punctuation omitted); *see In the Interest of M. S. S.*, 308 Ga. App. at 625 (3) ("To prove that the performance of [his] lawyer was deficient, the [father] must show that [his] lawyer performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms.").

[28] *In the Interest of S. B.*, 335 Ga. App. at 10 (2) (punctuation omitted); *accord In the Interest of M. S. S.*, 308 Ga. App. at 625 (3).

[29] *In the Interest of M. S. S.*, 308 Ga. App. at 625 (3) (punctuation omitted).

(a) Chauncy first argues that his trial counsel was ineffective by failing to file a legitimation petition on his behalf.

At the motion-for-new-trial hearing, Chauncy's trial counsel testified that he discussed "legitimation in general" with Chauncy. But counsel also testified that, after reviewing the evidence in the case (including that Chauncy had not had contact with C. S. "in some time"), he did not believe a legitimation petition would have ultimately been successful. In addressing this issue, the juvenile court found, *inter alia*, that—even if Chauncy's counsel was ineffective in failing to file a legitimation petition—Chauncy was not prejudiced because he was allowed to object to the termination petition and was afforded a full hearing on the issue. The court further noted that Chauncy confronted and cross-examined witnesses, called witnesses to testify on his own behalf, and provided argument against terminating his parental rights.

We agree with the trial court that Chauncy was not prejudiced by his counsel's failure to file a legitimation petition. In *In the Interest of S. B.*,[30] the parents of two children appealed the termination of their parental rights, and the father—who likewise had not legitimated the children—argued, as Chauncy does now, that his

---

[30] 335 Ga. App. 1 (780 SE2d 520) (2015).

20

counsel was ineffective for failing to file a legitimation petition prior to the termination proceedings.[31] And in that case, this Court held that counsel was deficient in this respect and that the father was prejudiced as a result.[32] But in doing so, we explained that under the old Juvenile Code, which applied in *S. B.*, a putative father's failure to file a legitimation petition "resulted in [his] inability to challenge the termination of his parental rights."[33] This is because, under the former statute, "[t]ermination of [a non-legitimated father's] parental rights was mandatory."[34] But on January 1, 2014, the relevant statutory provision was superseded by OCGA § 15-11-283—the statute that applies in this case.[35] In *S. B.*, we acknowledged that OCGA § 15-11-283 (b) "now gives the juvenile court discretion whether to terminate the

---

[31] *See id.* at 10 (2).

[32] *See id* at 10-11 (2).

[33] *Id.* at 10 (2).

[34] *Id.* at 10-11 (2); *see In the Interest of T. B. R.*, 304 Ga. App. 773, 786 (4) (697 SE2d 878) (2010) (holding, in a case in which the old Code applied, a biological father who failed to legitimate his child lacked standing to challenge the termination of his parental rights).

[35] *See In the Interest of S. B.*, 335 Ga. App. at 3 n.1; *supra* note 11.

parental rights of non-legitimated fathers."[36] Thus, unlike in *S. B.*, the new code applied, and Chauncy's failure to legitimate C. S. did *not* deprive him of the ability to challenge the termination of his parental rights. And in fact, the juvenile court in this case exercised its discretion under OCGA § 15-11-283 (b) to permit Chauncy to object to the termination of his parental rights, appoint him an attorney, conduct a full hearing on the matter, and issue a detailed order explaining its findings.

Chauncy argues, without referencing any legal authority,[37] that he was harmed by his counsel's failure to file a legitimation petition because a court can rely on a father's failure to do so as evidence of an intent to forego his parental duties. And according to Chauncy, "a large part of [Mary's] dependency and abandonment argument[s] was that [he] never attempted to establish a legal relationship with [his]

---

[36] *In the Interest of S. B.*, 335 Ga. App. at 11 n.2; *see* OCGA § 15-11-283 (b) ("The notice [of a termination petition] shall advise the biological father who is not the legal father that he *may* lose all rights to the child named in a petition brought pursuant to this article and will not be entitled to object to the termination of his rights to such child unless, within 30 days of receipt of notice, he files: (1) [a] petition to legitimate such child; and (2) [n]otice of the filing of the petition to legitimate with the court in which the termination of parental rights proceeding is pending." (emphasis supplied)).

[37] The closest Chauncy comes to making a legal argument is to note that OCGA § 15-11-283 (b) *now* gives a juvenile court discretion to allow a non-legitimated father to challenge the termination of his parental rights.

22

child." But in its 14-page order, the fact that Chauncy had not legitimated C. S. was only one of *many* findings of fact the juvenile court made in support of its termination decision. Indeed, the court also found, *inter alia*, that Chauncy had no meaningful contact with C. S. and had not paid any child support in three years, he engaged in a cyclic pattern of physical violence against the mothers of his children, he admitted to using drugs as recently as March 2018, he had not enrolled in a rehabilitation program despite a court order that he do so, and he had unresolved criminal issues, including that he was currently serving a felony sentence for possession of methamphetamine. Thus, Chauncy is incorrect that his failure to legitimate C. S. was the sole or primary basis for the court's termination decision.

Furthermore, as Chauncy's trial counsel testified, given the evidence in this case, a legitimation petition would likely have been unsuccessful. Indeed, when considering "a petition to legitimate, the trial court must first determine whether the father abandoned his opportunity interest to develop a relationship with the child."[38] And this opportunity interest "can be abandoned by the unwed father if not timely pursued."[39] And factors supporting a finding of abandonment of a father's opportunity

---

[38] *Wilbourn v. Lumpkin*, 327 Ga. App. 385, 386 (759 SE2d 262) (2014).

[39] *Id.*

23

interest include, without limitation, "a biological father's inaction during pregnancy and at birth, a delay in filing a legitimation petition, and a lack of contact with the child."[40] And here, it is undisputed that Chauncy did not provide any financial assistance or pay child support to Mary during her pregnancy or after C. S. was born, he did not attempt to legitimate C. S. in the five years between his birth and the termination proceedings, and he had no contact with C. S. for the previous three years. Under such circumstances, a legitimation petition filed by Chauncy's counsel at the time his termination counsel was appointed would likely have been denied.[41]

---

[40] *Id.*

[41] *See id.* at 388 (affirming the denial of a legitimation petition when, despite knowing about the mother's pregnancy, the father did not offer to assist in medical costs or subsequent childcare costs until the child was four years old, made no effort to be a part of the child's life until after he was asked to sign a parental release, and waited over four years to file a legitimation petition); *Neill v. Brannon*, 320 Ga. App. 820, 825 (1) (738 SE2d 724) (2013) (affirming the denial of a legitimation petition when the father waited more than four years after learning that he was the child's biological father to file a legitimation petition or even decide that he wanted a parent-child relationship with her and failed to communicate with the mother or child while he was incarcerated and in a residential drug rehabilitation program); *In the Interest of J. L. E.*, 281 Ga. App. 805, 806-07 (637 SE2d 446) (2006) (affirming the denial of a legitimation petition when the biological father waited nearly a year after the child was born to file a legitimation petition, had not had contact with the child since he was eight months old, and due to incarceration, the father was currently unable to develop a meaningful relationship with the child).

Thus, we cannot say that the juvenile court erred in finding that Chauncy was not prejudiced by his counsel's failure to file a legitimation petition.

(b) Chauncy also asserts that his trial counsel was ineffective for failing to object to harmful and inadmissible evidence of his alleged physical violence toward Mary, which was improper character evidence.

While Chauncy summarily contends that evidence of his violent conduct was inadmissible, he provides no legal authority to support this claim or a cognizable argument applying such authority to the facts of this case. As a result, he has abandoned any argument that his counsel was ineffective in this respect.[42] But it is worth noting that a parent's violent or abusive conduct is clearly admissible in termination proceedings,[43] and Chauncy's counsel was not required to make a meritless objection to such evidence.[44]

---

[42] *See supra* note 21.

[43] *See In the Interest C. L. C*., 277 Ga. App. 297, 302 (1) (626 SE2d 531) (2006) (considering, in a termination proceeding, the nature of the father's violent and abusive behavior); *In the Interest of G. W. R*., 270 Ga. App. 194, 201 (4) (606 SE2d 281) (2004) ("[T]he father's history of violence . . . constituted evidence from which the court could find that termination of parental rights was necessary to prevent serious harm to the children.").

[44] *Hall v. State*, 292 Ga. App. 544, 554 (6) (c) (664 SE2d 882) (2008) ("[F]ailure to make a meritless or futile objection or motion cannot be evidence of

For all these reasons, we affirm the juvenile court's termination of Chauncy's parental rights.

*Judgment affirmed. Gobeil and Hodges, JJ., concur*.

---

ineffective assistance." (punctuation omitted)).